AJ2/4817-0344-4130                    Firm I.D. No.46239                      12134-2

FILED
8/27/2019 11:10 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH09898

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

LOREL CONDOMINIUM ASSOCIATION, INC.,        )
an Illinois Not-for-Profit Corporation,     )
                                            )
                        Plaintiff,          )        No.   2019CH09898
                                            )
            v.                              )
                                            )        Hearing Date: 12/26/2019 9:30 AM - 9:30 AM
                                            )        Courtroom Number: 2301
CSX TRANSPORTATION, INC.,                   )        Location: District 1 Court
                                            )               Cook County, IL
                        Defendant.          )

### COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, LOREL CONDOMINIUM ASSOCIATION, INC., an Illinois Not-for-Profit

Corporation, by its attorneys, TRESSLER, LLP, for its Complaint for Injunctive Relief and Damages

against Defendant, CSX TRANSPORTATION, INC., states as follows:

### GENERAL ALLEGATIONS

1.    Plaintiff, LOREL CONDOMINIUM ASSOCIATION, INC., (hereinafter the

"Association") is a condominium association located in Oak Lawn, Illinois and subject to the

General Not-for-Profit Corporation Act and the Condominium Property Act.

2.    The Association acts through its Board of Directions, which has the power and

duty to operate and maintain the Common Elements of the real estate and improvements

located at 5201-5231 W. 110th Street; 5301-5334 W. 109th Street; 10902-10944 S. Lorel Avenue;

and 11009-11015 S. Cook Avenue in Oak Lawn, County of Cook, Illinois and legally described as

follows:

LOTS 352 THROUGH AND INCLUDING LOT 365 IN PHASE SIX OF EAGLE RIDGE
SUBDIVISION BEING A SUBDIVISION OF PART OF THE SOUTHWEST ¼ OF SECTION
16, TOWNSHIP 37 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN,

FILED DATE: 8/27/2019 11:10 AM  2019CH09898

EXHIBIT

A

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

IN COOK COUNTY, ILLINOIS AS RECORDED PER DOCUMENT NO. 00503580, RECORDED JULY 7, 2000.

*See* Affidavit of Patsy Kelly, attached hereto as Exhibit 1.

3.      The Board of Directors has standing and capacity to act on behalf of the Unit

Owners in matters relating to the Common Elements. *See* Paragraph 2 of Exhibit 1.

4.      Upon information and belief, Defendant, CSX TRANSPORTATION, INC.,

(hereinafter "CSX") is a foreign corporation licensed to do business in the State of Illinois.

5.      Upon information and belief, CSX is the record owner of the property located

directly adjacent to the property located at 5229 W. 110th Street through 5332 W. 109th Street

in Oak Lawn, County of Cook, Illinois.

6.      A brick and concrete wall divides the property owned by the Association and the

property owned by CSX.

7.      Multiple trees on CSX's property are located near the boundary line between the

two properties.

8.      The branches and roots of trees located on CSX's property have encroached on

the Association's property, above and beneath the brick wall.

9.      Specifically, trees roots and branches have grown under and are pushing against

the brick wall and onto to Association's property causing portions of the brick wall to fall,

buckle, and crack.

10.     On or about October 5, 2016, the Association put CSX on notice that the trees on

CSX's property were encroaching on the Association's property and causing damage. *See*

Paragraph 3 of Exhibit 1

2

11. On July 23, 2018, after numerous requests by the Association stressing the urgency for CSX to take action to avoid further damage to the Association's property, the Association's legal counsel sent correspondence to CSX demanding that CSX remove all trees in which the Association marked for removal by August 15, 2018. *See* Paragraph 4 of Exhibit 1.

12. On or about August 3, 2018, CSX removed certain portions of the trees encroaching on the Association's west end of the property. CSX did not remove any encroaching tree roots or any trees from the east end of the property. *See* Paragraph 5 of Exhibit 1.

13. On September 17, 2018, the Association's legal counsel sent correspondence to CSX demanding that CSX remove all trees within one foot of the Association's concrete wall before October 15, 2018. *See* Paragraph 6 of Exhibit 1.

14. To date, CSX has failed to remove the remaining encroaching trees and tree roots. *See* Paragraph 7 of Exhibit 1

15. As a result, the encroaching trees and tree roots continue to destabilize and damage the Association's brick wall.

## COUNT I – INJUNCTIVE RELIEF

16. The Association incorporates by reference paragraphs 1 through 15 of the General Allegations of the Complaint as if fully set forth herein.

17. The Association has an ascertainable right to the use and enjoyment of its property and for its property to be free and clear of encroaching trees and tree roots.

18. The Association's legal remedies are inadequate as the harm posed to the Association by the encroaching trees and tree roots are continuing in nature.

3

19.     The encroaching trees and tree roots must be removed from CSX's property to

stop continued and further damage to the Association's property.

20.     The Association will suffer irreparable injury in the absence of injunctive relief, as

the encroaching trees and tree roots will continue to grow and damage the Association's

property.

WHEREFORE, Plaintiff, LOREL CONDOMINIUM ASSOCIATION, INC., respectfully requests

that this Honorable Court enter judgment in its favor and against Defendant, CSX

TRANSPORTATION, INC., thereby grant the following relief:

   a.     A mandatory permanent injunction requiring CSX to remove all trees,
          including the tree roots located within 3 feet of the Association's brick
          wall;

   b.     A mandatory permanent injunction requiring CSX to maintain the trees
          on its property in order to prevent future trees and tree roots from
          encroaching on the Association's property; and

   c.     For such other and further relief as may be deemed just and proper.

## COUNT II – NEGLIGENCE

21.     The Association incorporates by reference paragraphs 1 through 15 of the

General Allegations of the Complaint as if fully set forth herein.

22.     At all relevant times, CSX owed a duty of reasonable care to the Association to

prevent damage to the Association's property caused by encroaching trees and tree roots.

23.     CSX breached its duty of care owned to the Association by negligently and

carelessly maintaining its property and allowing the trees and tree roots to encroach upon the

Association's property, after receiving notice from the Association of the encroachment and

damage being caused to the Association's property.

4

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

24.     As direct and proximate cause of CSX's negligence as aforesaid, the Association's

brick wall is damaged and requires repair and replacement. The Association has suffered and

continues to suffer damages in an amount in excess of $50,000.

WHEREFORE, Plaintiff, LOREL CONDOMINIUM ASSOCIATION, INC., prays for judgment

against Defendant, CSX TRANSPORTATION, INC., for a sum in excess of $50,000 plus costs.

Respectfully Submitted,

LOREL CONDOMINIUM ASSOCIATION, INC.

By: _/s/ Kathryn A. Formeller_____
One of its Attorneys

Kathryn A. Formeller, kformeller@tresslerllp.com
Anita Jahanban, ajahanban@tresslerllp.com
Tressler LLP
250 E. Boughton Road, Suite 250
Bolingbrook, IL 60440
(630) 343-5200
Attorney No. 46239

FILED
8/27/2019 11:10 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH09898

Firm I.D. No.46239

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

LOREL CONDOMINIUM ASSOCIATION, INC.,    )
an Illinois Not-for-Profit Corporation,    )
                                  )
              Plaintiff,    )    No.
                                  )
      v.    )
                                  )
CSX TRANSPORTATION, INC.,    )
                                  )
              Defendant.    )

## AFFIDAVIT OF PATRICIA KELLY IN SUPPORT OF PLAINTIFF'S COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

The undersigned, being duly first sworn on oath, deposes and states as follows:

1.    That she is a member of the Board of Directors of Lorel Condominium Association (the "Association").

2.    The Association, including all residential units that are part of the association, is governed by the Declaration of Condominium Ownership and of Easements, Restrictions, and Covenants for Lorel Condominium (hereinafter referred to as "Declaration") recorded as Document No. 0010581342 in the Office of the Recorder of Deeds of Cook County, Illinois ("Declaration"). A true and correct copy of the Declaration is attached hereto as **Exhibit A**.

3.    On or about October 5, 2016, the Association put CSX on notice that the trees on CSX's property were encroaching on the Association's property and causing damage.

4.    On July 23, 2018, after numerous requests by the Association stressing the urgency for CSX to take action to avoid further damage to the Association's property, the Association's legal counsel sent correspondence to CSX demanding that CSX remove all trees in

1



Firm No. 46239

which the Association marked for removal by August 15, 2018. A true and correct copy of the July 18, 2018 correspondence is attached hereto as **Exhibit B**.

5.      On or about August 3, 2018, CSX removed certain portions of some of the trees encroaching on the Association's west end of the property. CSX did not remove any encroaching tree roots or any trees from the east end of the property.

6.      On September 17, 2018, the Association's legal counsel sent correspondence to CSX demanding that CSX remove all trees within one foot of the Association's concrete wall before October 15, 2018. A true and correct copy of the September 17, 2018 correspondence is attached hereto as **Exhibit C**.

7.      To date, CSX has failed to remove the remaining encroaching trees and tree roots.

FURTHER AFFIANT SAYETH NAUGHT.

Patricia Kelly

2

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

Firm No. 46239

## **VERIFICATION**

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned states that the statements set forth in this Instrument are true and correct, except as to matters therein stated to be on information and belief as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

Kathryn A. Formeller, kformeller@tresslerllp.com
Anita Jahanban, ajahanban@tresslerllp.com
Tressler LLP
550 East Boughton Road, Suite 250
Bolingbrook, IL 60440
(630) 343-5191

FILED
8/27/2019 11:10 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH09898

**0010581342**

3289/0155 07 001 Page 1 of 45
**2001-07-02 11:14:50**
Cook County Recorder          215.00

Prepared by and Return to:
Hartz Construction Co., Inc.
8995 W. 95th Street
Palos Hills, IL 60465

### DECLARATION OF CONDOMINIUM OWNERSHIP AND OF EASEMENTS, RESTRICTIONS, AND COVENANTS FOR LOREL CONDOMINIUM

THIS DECLARATION is made by New Lenox State Bank, as Trustee under Trust Number 2033, dated January 18, 1996, hereinafter known as "Declarant" and Hartz Construction Co., Inc., hereinafter known as "Developer".



### WITNESSETH:

A.  The Declarant New Lenox State Bank, as Trustee, under Trust Number 2033, dated January 18, 1996, is the owner in fee simple of the following described parcel of real estate in the Village of Oak Lawn, County of Cook, State of Illinois:

LOTS 352 and 353, IN EAGLE RIDGE SUBDIVISION PHASE SIX, being a subdivision of part of the Southwest ¼ of Section 16 Township 37 North, Range 13, East of the Third Principal Meridian in Cook County, Illinois as recorded per Document No. 00503580, recorded July 7, 2000.

Part of PIN #24-16-300-088, #24-16-300-077 and #24-16-300-091

Addresses:  5201, 5203, 5205, 5207 West 110th Street and 11009, 11011, 11013, 11015 South Cook, Oak Lawn, Illinois 60453

B.  The Declarant further desires and intends by this Declaration to submit the Property (as hereinafter defined) to the provisions of the Condominium Property Act of the State of Illinois, as amended from time to time.

C.  The Declarant further desires and intends by this Declaration to establish for its own benefit and for the benefit of all future owners and occupants of the Property, and each part thereof, certain easements and rights in, over and upon the property and certain mutually beneficial restrictions and obligations with respect to the use and maintenance thereof.

D.  The Property shall from and after the date of the recording of this Declaration be known as LOREL CONDOMINIUM or such other name as may be subsequently adopted pursuant to the Act (as hereinafter defined) by the Board (as hereinafter defined).

E.  The Declarant desires and intends by this Declaration to declare that the owners, mortgagees, occupants and other persons acquiring any interest in the Property shall at all times enjoy the benefits of and shall at all times hold their interests subject to the rights, easements, privileges and restrictions hereafter set forth, all of which are declared to be in furtherance of a plan to promote and protect the cooperative aspect of ownership, and to facilitate the proper administration of the Property and are established for the purpose of enhancing and perfecting the value, desirability and attractiveness of the Property.

G:Declarations:Amendments Folder:Declarations

**EXHIBIT**
**A**          1

RECORDING FEE    215 00
DATE    7/2/01
OK BY    9YM    45

FILED DATE: 8/27/2019 11:10 AM    2019CH09898

NOW THEREFORE, the Declarant as the holder of legal title to the afore-described real estate and for the purposes above set forth DECLARES AS FOLLOWS:

## ARTICLE I
## DEFINITIONS

For the purpose of brevity and clarity certain words and terms used in the Declaration are defined as follows:

A. Act means the Condominium Property Act of the State of Illinois, as amended from time to time.

B. Association means Lorel Condominium Association.

C. Balcony or Patio means the portion of the Common Elements designated as such on the Plat.

D. Board means the Board of Directors of the Association.

E. Buildings means all structures, attached or unattached containing one or more Units constructed at any time on the parcel.

F. By-Laws means the By-Laws of the Association which are set forth in this Declaration, as may be amended from time to time.

G. Closing means the date on which title to a Unit Ownership is conveyed by Declarant to a Purchaser.

H. Common Elements means all portions of the Property except the Units, including Limited Common Elements unless otherwise specified.

I. Common Expenses means the proposed or actual expenses affecting the Property, including Reserves, if any, lawfully assessed by the Board.

J. Condominium Instruments means all documents and authorized amendments thereto recorded pursuant to the provisions of the Act, including this Declaration, the By-Laws and the Plat.

K. Declaration means this instrument by which the Property is submitted to the provisions of the Act, and all Exhibits attached to this instrument and all amendments to this instrument made from time to time pursuant to the provisions of this instrument.

L. Developer means Hartz Construction Co., Inc., including any successor or successors to the entire interest of such party in the Property other than the purchaser of any Individual Unit.

M. Limited Common Elements means a portion of the Common Elements so designated in this Declaration or on the Plat as being reserved for the use of a certain unit or units to the exclusion of other units. Any portion of the common elements which, by the terms of this Declaration or by its nature or location, is clearly intended to serve exclusively a certain unit or

G:DeclsandAmendmentsFolder:Declaration/OREL8/22/01.doc

2

units (but less than all of the units) or the owner or owners thereof shall be deemed a limited common element, specifically the storage area, the patios, balconies and assigned parking spaces, if any (the unassigned parking spaces shall be considered Common Elements).

N. Majority of Unit Owners means those Unit Owners, without regard to their number, who own more than fifty (50%) percent in the aggregate of the entire undivided ownership interest in the Common Elements. Any specified percentage of the Unit Owners shall mean those Unit Owners who, in the aggregate, own such specified percentage of the entire undivided ownership interest in the Common Elements.

O. Occupant means a person in possession of a Unit regardless of whether such person is a Unit Owner.

P. Parcel means the entire tract of land legally described on page 1 of this Declaration, submitted to the provisions of the Act.

Q. Parking Area means each portion of the Common Elements for public or guest parking spaces and driveways for ingress and egress.

R. Parking Space means a portion of the public or guest Parking Area intended for the parking of one motor vehicle.

S. Person means a natural individual, corporation, partnership, Trustee or other legal entity capable of holding title to real property.

T. Plat means the Plats of Survey attached to this Declaration as Exhibit "A".

U. Property means all the land, property and space compromising the Parcel, all improvements and structures erected, constructed or contained therein or thereon, including without limitation, the Buildings and all easements, rights and appurtenances belonging thereto, and all fixtures and equipment intended for the mutual use, benefit or enjoyment of the Unit Owners, submitted to the provisions of the Act.

V. Purchaser means any Person other than the Developer who purchases a Unit in a bona fide transaction for value.

W. Reserves means those sums paid by Unit Owners which are separately maintained by the Board for purposes specified by the Board or the Condominium Instruments.

X. Unit means a part of the Property designated and intended for any type of independent use delineated on the Plat of Survey attached hereto as Exhibit "A".

Y. Unit Owner means the Person or Persons whose estates or interest individually or collectively, aggregate fee simple absolute ownership of a Unit.

Z. Unit Ownership means a part of the Property consisting of one Unit and the undivided percentage interest in the Common Elements allocated thereto.

AA. Voting Member means the person entitled to exercise all voting power in respect to a Unit Ownership.

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

## ARTICLE II
## UNITS

A. Description. All Units are delineated on the Plat and are listed on Exhibit B attached hereto. Each Unit consists of the space enclosed and bounded by the horizontal and vertical planes set forth in the delineation thereof on Exhibit A attached hereto as well as any pipes, ducts, flues, shafts, electrical wiring and conduits, and individual heating, cooling, and ventilation systems or equipment situated entirely within a Unit and serving only such Unit. The legal description of each Unit shall consist of the identifying number or symbol of such Unit as shown on Exhibit A attached hereto. Every deed, lease, mortgage or other instrument may legally describe a Unit by its identifying number or symbol as shown on Exhibit A attached hereto and every such Description shall be deemed good and sufficient for all purposes.

B. Combination of Units. No Unit Owner shall, by deed, plat, court decree or otherwise, combine or subdivide or in any other manner cause any Unit owned by such Unit Owner to be separated into any tracts or parcels different from the whole Unit as shown on the Plat.

C. Certain Structures Not Constituting Part of a Unit. A Unit shall not include any structural component of any of the Buildings, including structural columns or pipes, wires, conduits ducts, flues, shafts, or public utility lines running through a Unit and forming a part of any system serving more than one Unit or the Common Elements, if any, located in a Unit, whether or not any such items shall be located in the floors, ceilings or perimeter of interior walls of the Unit.

## ARTICLE III
## COMMON ELEMENTS

A. Description. The Common Elements include, without limitation; the land, public utility lines, public or guest parking areas, outside walks and driveways, retention area, landscaping and all other portions of the Property except the Units. Any reference to "Common Elements" appearing on the Plat shall be deemed solely for purposes of general information, shall not be limiting in any way.

B. Ownership of Common Elements. Each Unit Owner shall be entitled to the percentage of ownership in the Common Elements allocated to the respective Unit owned by such Unit Owner as set forth in Exhibit B attached hereto. The percentages of ownership interests set forth in such Exhibit B have been computed and determined in accordance with the Act. Each of such ownership interests in the Common Elements shall be owned by the Unit owners as tenants in common in accordance with their respective percentages of ownership. The ownership of each Unit shall not be conveyed separate from the percentage of ownership in the Common Elements corresponding to said Unit. The undivided percentage of ownership in the Common Elements corresponding to any Unit shall be deemed conveyed or encumbered with that Unit, even though the legal description in the instrument conveying or encumbering said Unit may refer only to the fee title to that Unit.

C. Use of Common Elements in General. Each Unit Owner shall have the right to use the Common Elements in common with all other Unit Owners, as may be required for the purpose of access, ingress to, egress from, use, occupancy and enjoyment of the Unit owned by such Unit Owner. Such right to use the Common Elements shall extend to not only each Unit Owner, but also to such Unit Owner's agents, servants, tenants, lessees, family members, customers, invitees and guests. Such rights to use the Common Elements shall be subject to and governed

G:DeedsandAmendmentsFolder:DeclarationIOREL6/22/01.doc

4

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

by the provisions of the Act, the Condominium Instruments and the rules and regulations of the Board. In addition, subject to the provisions of the Condominium Instruments and the Act, the Board shall have the authority to lease, grant concessions or grant easements with respect to parts of the Common Elements. Any income derived by the Board from leases, concessions or other sources shall be held and used for the benefit of the members of the Association pursuant to such rules and regulations as the Board may adopt or prescribe.

D. Disclaimer of Bailee Liability. Notwithstanding anything to the contrary contained in this Declaration, neither the Board, the Association, any Unit Owner, the Developer nor the Corporation shall be (i) considered a bailee of any personal property located in the Common Areas, or any vehicle parked in the Parking Area, if any, whether or not the exclusive possession of any particular area shall be given to any Unit Owner for parking purposes, or (ii) responsible for the security of such personal property or for any loss or damage thereto whether of not due to negligence.

## ARTICLE IV
### GENERAL PROVISIONS AS TO UNIT AND COMMON ELEMENTS

A. Submission of Property to the Act. The Property is hereby submitted to the Provisions of the Act.

B. No Severance of Ownership. No Unit Owner shall execute any deed, mortgage, lease of other instrument affecting title to Unit Ownership owned by such Unit Owner without including therein both interest in the Unit and the corresponding percentage of Common Element Ownership owned by such Unit Owner without including therein any such deed, mortgage, lease or other instrument purporting to affect the one without including also the other shall be deemed and taken to included the interest so omitted even though the latter is not expressly mentioned or described therein.

C. Easements.

1. Encroachments. In the event that (i) by reason of the construction, repair, reconstruction, settlement or shifting of any of the Buildings, any part of the Common Elements encroaches or shall hereafter encroach upon any part of any Unit, or any part of any Unit encroaches or shall hereafter encroach upon any part of the Common Elements of any other Unit, or (ii) by reason of the design or construction of any Unit, it shall be necessary or advantageous to a Unit Owner to use or occupy any portion of the Common Elements for any reasonable use appurtenant to said Unit which will not unreasonably interfere with the use or enjoyment of the Common Elements by other Unit Owners, or (iii) by reason of the design or construction of any utility, heating, cooling or ventilation systems, and pipes, ducts, flues, shafts, or conduits serving more than one Unit encroach or shall hereafter encroach   upon any part of any Unit, then in any such case valid easements for the maintenance of such encroachment and for such of the Common Elements are hereby established and shall exist for the benefit of such Unit, or the Common Elements, as the case may be;   provided, however, in no event shall a valid easement for any encroachment or use of the Common Elements be created in favor of any Unit Owner if such encroachment or use is detrimental to or interferes with the reasonable use and enjoyment of the Property by the other Unit Owners.

2. Easements for Utilities. Ameritech, ComEd Company, Nicor Gas Company, cable television, and all other suppliers of utilities serving the Property are hereby granted the right to

G:DecksandAmendmentsFolder:DeclarationIOREL8/22/01.doc

5

FILED DATE: 8/27/2019 11:10 AM    2019CH09898

install, lay, construct, operate, maintain, renew, repair or replace; conduits, cables, pipes and wires and other equipment in, to, over, under, along and on any portions of the Common Elements for the purpose of providing the Property with utility services, together with the reasonable right of ingress to and egress from the Property for said purpose. The Developer or the Board may hereafter grant other or additional easements for utility purposes for the benefit of the Property over, under, along and on any portion of the Common Elements, and each Unit Owner and other Person having at any time any interest in the Property hereby grants to the Developer or to the Board an irrevocable power of attorney to execute, acknowledge and record for and in the name of such Unit Owner and other Persons such instruments as may be necessary to effectuate the foregoing. Easements are also hereby declared and granted the Developer, the Board and their respective representatives, employees and contractors to enter and work in any Unit to install, lay, operate, maintain, repair and replace any pipes, lines, wires, ducts, flues, shafts, conduits, public lines, components of the communications systems, if any, or structural components, which may run through or in the floor, ceiling or walls of or in a Unit.

3. __Easements Reserved by the Developer.__   The Developer and each of its agents, employees contractors, guests, invitees, and licensees, shall have the right and easement at all times to use the Common Elements   (i)   to perform any construction, maintenance, repair, renovation, restoration or rehabilitation of, in or under, all of any part of the Property which the Developer desires to perform,  (ii)  for the purpose of selling, displaying, and have ingress to and egress from one or more of the Units and all of any part of the Additional Land and improvements or Units thereon,  (iii), for the purpose of erecting, maintaining and displaying one or more of the signs desired by Developer.  Nothing in this Declaration shall in any way affect, alter, modify, amend or terminate any Declaration of Easements signed by the Developer and recorded prior to the recording of this Declaration. If the Developer constructs any improvements on any part of the Additional Land and if any such improvements encroach upon any part of the Common Elements, such improvements shall have a valid easement for such encroachment and the maintenance and use thereof and such easement shall be in favor of the Developer and each of its respective successors or assigns.

4. __Easements to Run with Land.__   All easements and rights described in this Article IV are easements and rights appurtenant running with the land, and in perpetuity shall remain in full force and effect and inure to the benefit of each person and entity specified in this Article IV in whose favor such easement Is granted, and be binding on the Property and each Unit Owner, purchaser, mortgagee and other person having an interest in the Property or any part thereof. Reference in the respective deeds of conveyance, or in any mortgage or trust deed or other evidence of obligation, to the easements and rights described in the Declaration shall be sufficient to create and reserve such easements and rights to the respective grantees as fully and completely as though such easements and rights were recited fully  and set forth in their entirety in such documents.

## ARTICLE V
## COMMON EXPENSES, MORTGAGES
## AND REAL ESTATE TAXES

A.   __Common Expenses.__    Each Unit Owner shall pay his proportionate share of the Common Expenses. Such proportionate share of the Common Expenses for each Unit Owner, shall be in the same ratio as his percentage of ownership interest in the Common Elements. Payment thereof shall be in such amounts and at such times as determined in the manner provided in the By-Laws. If any Unit Owner shall fail or refuse to make any such payment of the

Common Expenses when due, the amount thereof, together with interest, late charges, reasonable attorney fees and costs of collection or the amount of any unpaid fine, shall constitute a lien on the Unit ownership of such Unit Owner as provided in the Act. The developer is hereby granted the right to impose a charge at the initial closing of each respective unit, as and for a nonrefundable capital contribution for reserve or repair in an amount equal to triple the then current monthly maintenance assessment.

B. <u>Separate Mortgage.</u> Each Unit Owner shall have the right, subject to the provision of the Declaration, to make a separate mortgage or encumbrance on such Unit Owner's Unit Ownership. No Unit Owner shall have the right or authority to make or create or cause to be made or created any mortgage or encumbrance or other lien on or affecting the Property or any part thereof other than such Unit Owner's Unit Ownership.

## ARTICLE VI
## INSURANCE

A. <u>Type of Insurance.</u> The Board shall have the authority to and shall obtain the following insurance for the Property:

1. Insurance on the Property, including the Units and the Common Elements, against loss or damage by fire and against loss or damage by risks now or hereafter embraced by standard extended coverage and vandalism and malicious mischief endorsements, in an amount sufficient to prevent the insured from being a coinsurer within the terms of the applicable policies, but in any event in an amount not less than one hundred (100%) percent of the full insurable replacement cost thereof. The "full insurable replacement cost" of the Property, including the Units and the Common Elements, shall be determined from time to time by the Board, which determination may be based upon appropriate insurance appraisals. Insurance replacement cost shall be deemed to be the cost of restoring the Common Elements, Units, or any part thereof, to substantially the same condition in which they existed prior to damage or destruction. The cost of any and all such appraisals shall be Common Expenses;

2. Comprehensive public liability and property damage insurance against claims for personal injury or death or property damage suffered by the public or by and Unit Owner occurring in, on or about the Property, such public liability and property damage insurance to afford protection to such limits as the Board shall deem desirable, but in no event for less than One Million Dollars ($1,000,000.00) with respect to liability for personal injury or property damage arising out of a single accident;

3. Such Worker's Compensation Insurance as may be necessary to comply with applicable laws;

4. Employer's liability insurance in such amount as the Board shall deem desirable;

5. A fidelity bond indemnifying the Association, the Board and the Unit Owners for loss of funds resulting from fraudulent or dishonest acts of any employees of the Association or of any other person handling the funds of the Association, the Board or the Unit Owners in such amount as the Board shall deem desirable; and

G:DecksandAmendmentsFolder:DeclarationlOREL8/22/01.doc

7

FILED DATE: 8/27/2019 11:10 AM    2019CH09898

6. Such other insurance (including insurance with respect to officers' and directors' liability) in such reasonable amounts as the Board shall deem desirable, or as may be necessary to comply with applicable laws.

The premiums for the above-described insurance shall be Common Expenses. All of such insurance shall be effected under valid and enforceable policies issued by insurers of recognized responsibility authorized to do business in the State of Illinois.

B. Named Insured.  All policies of insurance of the character described in subparagraphs 1 and 2 of the preceding Paragraph A, shall (i) name as insured the Developer, so long as it has an insurable interest, and the Board as trustees for the Unit Owners in the respective interests of all of such insureds may appear, (ii) be without contribution as respects to other such policies of insurance carried individually by the Unit Owners whether such insurance covers their respective Units and/or the additions and improvements made by such Unit Owners to their respective Unit, (iii) provide that, notwithstanding any provisions thereof which gives the insurer an election to restore damage in lieu of making a cash settlement therefore, such option shall not be exercisable in the event the Unit Owners elect to sell the Property or remove the Property from the provisions of the Act, (iv) contain an endorsement to the effect that such policy shall not be terminated for nonpayment of premiums without at least ten (10) days prior written notice to the mortgagee of each unit, and (v) contain an endorsement or clause, if available, whereby the insurer waives any right to be subrogated to any claim against the Association, its officers, the Board or its members, the Developer, the managing agent, each of their respective employees and agents, and the Unit Owners and the Occupants.  Policies of insurance of the character described in subparagraph 1 of the preceding Paragraph A may contain an endorsement extending coverage so as to include the payment of Common Expenses with respect to damaged Units during the period of reconstruction thereof.  Notwithstanding the issuance of standard mortgage clause endorsements under the preceding Paragraph A., any losses under such policies shall be payable, and all insurance proceeds recovered thereunder shall be  applied and disbursed, in accordance with the provisions of this Declaration.

C. Named Insured.  All policies of insurance of the character described in subparagraph 3, 4, 5, and 6 of the preceding Paragraph A shall name as insured each Unit Owner and their spouses (but as to the insurance described in such subparagraph 3 only with respect to those portions of the Property not reserved for their exclusive use), the Association, the Developer, the Board and its managing agent, the other agents and employees of Association.

In addition, all policies of insurance of the character described in such subparagraph 3 shall contain an endorsement clause whereby the insurer waives any right to be subrogated to any claim against the Association, its officers, members of the Board, the Developer, the managing agent, their respective employees and agents and the Unit Owners and Occupants and shall cover claims of one or more insured parties against other insured parties.

D. Premium Payment.  The Association, for the benefit of the Unit Owners and the mortgagee for each Unit, shall pay the premiums on the policies of insurance described in the preceding Paragraph A at least thirty (30) days prior to the expiration dates of the respective policies.  Within ten (10) days after the date on which payment is made, the Insurance Company shall give written notice of such payment to the holder of any duly recorded mortgage or trust deed against any Unit entitled to notice under Paragraph A of Article XVIII of this Declaration.

E. <u>Payment of Loss.</u> The loss, if any, under any policies of insurance of the character in subparagraphs 1 and 2 of the preceding Paragraph A shall be payable and the insurance proceeds paid on account of any such loss shall be applied and disbursed, as follows:

To the Board, as trustee for each of the Unit Owners in their respective percentage of ownership in the Common Elements as established in this Declaration, which insurance proceeds, less the actual cost, fees and expenses, if any, incurred in connection with the adjustment of the loss, shall be applied to the payment of the cost of restoring the Property to substantially the same condition in which it existed immediately prior to such damage or destruction, with each Unit and the Common Elements having the same vertical and horizontal boundaries as before, free from vendor's, mechanic's, materialman's and other similar liens.

F. <u>Unit Owner's Insurance.</u> Each Unit Owner shall be responsible for his own insurance on the contents of his own Unit, and furnishings and personal property therein, and his personal property stored elsewhere on the Property, and his personal liability to the extent not covered by the policies of liability insurance obtained by the Board for the benefit of all the Unit Owners as above provided. All policies of casualty insurance carried by each Unit Owner shall be without contribution as respect to the policies of casualty insurance obtained by the Board for the benefit of all the Unit Owners as above provided. The Board may require evidence of each Unit Owner's insurance policy on as annual basis.

G. <u>Improvements to Units.</u> Each Unit Owner shall be required to report all additions or alterations to his Unit promptly in writing to the Board, without prior request from the Board or the management agent, and to reimburse the Board for any additional insurance premiums attributable thereto, and each Unit Owner shall be responsible for any deficiency in and insurance loss recovery which results from such Unit Owner's failure to so notify the Board. The Board shall not be responsible for obtaining insurance on such additions, alterations or improvements unless and until such Unit Owner shall make arrangements satisfactory to the Board for such additional premiums; and upon the failure of such Unit Owner to do so, the Board shall not be obligated to apply any insurance proceeds to restore the affected Unit to a condition better than the alterations or improvements. "Additions" or "Alterations" shall mean property attached to the Unit, including, but not limited to, carpeting, special flooring, special wall covering and paneling. The insurance coverage described in this Paragraph G shall not be deemed to include personal property owned by the Unit Owner and not attached to the Unit.

H. <u>Release.</u> Each Unit Owner hereby waives and releases any and all claims which he may have against any other Unit Owner, the Association, its officers, members of the Board, the Developer, the manager and managing agent of the Property, if any, and their respective employees and agents, for any damage to the Common Elements, the Units, or to any personal property located in the Unit or Common Elements caused by fire or other form of casualty insurance.

I. <u>Cancellation of Insurance.</u> The Board shall be responsible, in the event any insurance required under subparagraph 1, 2 or 3 of the preceding Paragraph A is cancelled, for serving notice of such cancellation upon each insured thereunder.

### ARTICLE VII
### ADMINISTRATION

9

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

A. Association. The Association shall be the governing body for all of the Unit Owners for the maintenance, repair, replacement, administration and operation of the Common Elements and for the other purposes specified in this Declaration. The Developer or the Association after the recording of the Declaration, may cause the Association to be incorporated under the laws of Illinois as a not-for-profit corporation under the name Lorel Condominium Association, Inc. The Association shall not be deemed to be conducting business of any kind, and all funds received by the Association shall be held and applied by it for the use and benefit of all Unit Owners in accordance with the provisions of this Declaration. Each Unit Owner shall be a member of the Association so long as he shall be a Unit Owner and upon the transfer of his Unit Ownership the new Unit Owner succeeding to such Unit Ownership shall likewise succeed to such membership in the Association. The Association may issue certificates evidencing membership therein and shall have only one class of membership. The Association may become affiliated with another association, including an "umbrella" association, which the Board determines will result in beneficial relations.

B. Administration. The administration of the Property shall be vested in the Board of Directors of the Association which shall consist of three (3) persons who shall be elected in the manner set forth in the By-Laws; provided, however, that, notwithstanding anything to the contrary set forth in this Declaration, during the period commencing on the date of the Declaration and ending upon the qualification of the directors elected at the initial meeting of the Voting Members, the Board shall consist of three (3) persons who shall be designated and selected by Developer. The Board of Directors of the Association shall be deemed to be the Board of Managers for the Unit Owners referred to in the Act. Except for the directors so designated by the Developer:

(i) each member of the Board shall be one of the Unit Owners and shall reside on the Property; provided, however, if a Unit Owner is a corporation, partnership, trust or other legal entity other than a natural person or persons, then any designated agent of such corporation, partnership, trust of other legal entity or any beneficiary of any such trust shall be eligible to serve as a member of the board so long as such agent or beneficiary resides on the Property, and

(ii) if a member of the Board fails to meet such qualifications during such member's term, such member shall thereupon cease to be a member of the Board and such member's place on the Board shall be deemed vacant.

C. Duties and Powers of the Association. The duties and powers of the Association and the Board shall be those set forth in the Articles of Incorporation of the Association, if any, and this Declaration (including the By-Laws); provided, however, the terms and provisions of the Act shall control in the event of any inconsistency between the Act, on the one hand, and this Declaration, the By-Laws and such Articles of Incorporation, if any, on the other hand.

D. Board's Determination Binding. In the event of any dispute or disagreement between any Unit Owners relating to the Property, or any question of interpretation of application of this Declaration or the By-Laws, the determination thereof by the Board shall be final and binding on each and all of such Unit Owners.

E. Liability of the Board. Neither the members of the Board nor the officers of the Association shall be liable to the Unit Owners or to the Association for any mistake of judgment or for any other acts or omissions of any nature whatsoever as such Board members and officers except for any acts or omissions found by a court to constitute gross negligence or fraud. The Unit Owners and the Association shall indemnify and hold harmless each of the members of the

G:DecksandAmendmentsFolder:DeclarationlOREL6/22/01.doc

10

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

Board and each of the officers of the Association against all contractual and other liabilities to others arising out of contracts made by or other acts of the Board and officers of the Association on behalf of the Unit Owners or the Association or arising out of their status as Board members or officers unless any such contract or act shall have been made fraudulently or with gross negligence or contrary to the provisions of the Declaration. It is intended that the foregoing indemnification shall include indemnification against all costs and expenses (including, but not limited to, counsel fees, amounts of judgments paid and amounts paid or received in settlement) reasonably incurred in connection with the defense of any claim, action, suit or proceeding, whether civil, criminal, administrative, or other, in which any member of the Board or officers of the Association may be involved by virtue of such persons being or having been such member or officer; provided, however, that such indemnity shall not be operative with respect to (a) any matter as to which such person shall have been finally adjudged in such action, suit or proceeding to be liable for gross negligence or fraud in the performance of his duties as such member or officer. It is further intended that the foregoing indemnification shall also include indemnification by the Association in connection with any threatened or pending claim, action or suit, by or on behalf of the Unit Owners and/or the Association and against the Developer and/or said Board Members or Officers arising out of any claimed errors in funding reserves."

## ARTICLE VIII
## MAINTENANCE, ALTERATIONS AND DECORATING

A. <u>Maintenance, Repairs and Replacements by Unit Owners.</u> Except as required by the Act or otherwise provided in this Declaration, each Unit Owner, at such Unit Owner's sole cost and expense, shall provide and be responsible for all maintenance, repair and replacement required to keep in good condition (i) the Unit owned by such Unit Owner, (ii) all windows, refrigerators, ranges, ovens, dishwashers, air conditioning units, appliances and heating, lighting, plumbing and electrical fixtures and equipment within such Unit and serving only such Unit. Notwithstanding anything in this Declaration to the contrary, the Board shall, subject to rules and regulations adopted by it, provide for and be responsible for the maintenance of uniform landscaping of all Common Elements, as well as maintenance of all Parking Areas and shall provide rules and regulations for the maintenance and appearance of the Common Elements. The costs and expenses incurred by the Board in connection with the maintenance of uniform landscaping, patios or balconies, if any, and maintenance of Parking Areas and driveways, if any, and fences or walls, shall be part of the Common Expenses. Any charge or expense in connection with expenditures for the Limited Common Elements shall be assessed only against that unit to which such Limited Common Elements are assigned.

B. <u>Maintenance, Repairs and Replacement by the Board.</u> The Board shall provide and be responsible for all maintenance, repair and replacement required to keep in good condition the Common Elements other than the Limited Common Elements. The cost and expense of the maintenance, repair and replacement of the Common Elements (other than the Limited Common Elements) and the cost and expense of the maintenance, repair and replacement of the Limited Common Elements, if any, which the board elects to maintain, repair or replace shall be part of the Common Expenses.

C. <u>Payment of Mechanic's Lien Claims by the Board.</u> The Board may cause to be discharged any mechanic's lien or other encumbrance which arises from labor or material furnished or supplied after the date of this Declaration and which, in the opinion of the Board, may constitute a lien against the Property and/or the Common Elements, rather than a lien against a particular Unit Ownership. If all of the Unit Owners are responsible for the existence of any such

FILED DATE: 8/27/2019 11:10 AM    2019CH09898

lien against the Property and/or the Common Elements, the amount paid by the Board to discharge such lien and costs and expenses (including attorney's fees) incurred by reason of such lien shall be part of the Common Expenses. If less than all the Unit Owners are responsible for the existence of any such lien against the Property and/or Common Elements, the Unit Owners responsible for such liens shall be jointly and severally liable for the amount necessary to discharge such lien and the costs and expenses (including attorneys' fees) incurred by reason of such lien.

D. <u>Damage Caused by a Unit Owner.</u>  If, due to the act or neglect of a Unit Owner, a member of his family, a guest, agent, employee, invitee, tenant or other Occupant or visitor of such Unit Owner, (i) damage shall be caused to any portion of the Common Elements which Board is required or has elected to maintain, repair or replace, such Unit Owner, promptly upon demand by the Board, shall reimburse the Board for the amounts paid by the Board to repair such damage, or (ii) damage shall be caused to any Unit or other portion of the Property which a Person other than such Unit Owner is required to maintain, repair or replace, such Unit Owner, promptly upon demand by such Person, shall reimburse such Person for the amounts paid by such Person to repair such damages. If due to the act or neglect of a Unit Owner, access to the Common Area Sprinkler System is denied and damage is caused to the landscaping from lack of water, the Unit Owner shall be responsible for the costs of replacement or repair of the landscaping.

E. <u>Authority of Board.</u>  The Board shall have authority to take, or refrain from taking, any action pursuant to this Article VIII. Nothing in this Article shall be construed to impose a contractual liability on the Board for maintenance, repair or replacement, and the Board's liability shall be limited to damages resulting from negligence. All expenses which, pursuant to this Article VIII, are chargeable to any Unit Owner may be specifically assessed to such Unit Owner and shall be payable by such Unit Owner as prescribed by the Board.

F. <u>Improvements by a Unit Owner.</u>  No alteration of any Common Elements or any additions of improvements thereto shall be made by any Unit Owner without the prior written approval of the Board. Any Unit Owner may make alterations, additions and improvements within the Unit owned by such Unit Owner after written notice to the Board and without the prior written approval of the Board, but such Unit Owner shall be responsible for any damage to other Units, the Common Elements, or the Property as a result of such alterations, additions, or improvements. Nothing shall be done in any Unit, or in, or to the Common Elements, which will impair structural integrity of any of the Buildings.

G. <u>Decorating.</u>  Each Unit Owner shall furnish and be responsible for, at such Unit Owner's sole cost and expense, all of the decorating within such Unit Owner's Unit, including without limitation painting, wallpapering, washing of the interior surfaces of windows, patio or balcony doors and other glass, other cleaning, paneling floor covering, draperies, window shades, curtains, lamps and other furnishing and interior decorating. Notwithstanding the foregoing, the use of and the covering of the surfaces of the windows, whether by draperies, shades or other items visible on the exterior of any of the Buildings and the use and decorating of balconies and patios shall be subject to the rules and regulations of the Board. Decorating of the Common Elements and any redecorating of Units caused by maintenance, repair or replacement work on any of the Common Elements by the Board, shall be furnished by the Board as part of the Common Expenses.

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

H. Board's Election to Repair Unit. Whenever the Board shall determine, in its discretion, that any maintenance, repair or replacement of any portion of any Unit or the Limited Common Elements which the Unit Owners of such Unit is required to maintain, repair or replace pursuant to Paragraph A above is necessary to protect (i) the portion of the Common Elements which the Board is required or has elected to maintain, repair or replace under this Declaration, or (ii) any other portion of the Property, the Board may cause a written notice of the necessity for such maintenance, repair or replacement to be served by mailing the same by certified mail addressed to the Unit Owner at that Unit. If such Unit Owner fails or refuses to perform any such maintenance, repair or replacement within a reasonable time stated in the notice (or any extension thereof approved by the Board), the Board may cause such maintenance, repair or replacement to be performed at the cost and expense of such Unit Owner.

## ARTICLE IX
## LEASE OF UNIT OWNERSHIP

A. Lease by Unit Owner. Any Unit Owner shall have the right to lease all (and not less than all) of his Unit Ownership upon such terms and conditions as the Unit Owner may deem advisable, except that no Unit Ownership shall be leased for transient or hotel purposes. Any lease of a Unit Ownership for less than thirty days (30) shall be deemed to be a lease for transient of hotel purposes. All leases shall be in writing and it shall be the duty of the lessee to comply with terms of the Declaration; in no event, however, shall the absence of the provision in any such lease requiring the lessee to comply with the terms of this Declaration excuse the lessee from complying with this Declaration and the failure to do so shall be a default under the lease notwithstanding the absence of a provision to that effect contained therein. All leases must be submitted to the Board immediately following execution of the lease.

B. Lease by Developer. Notwithstanding anything contained in this Declaration to the contrary, the Developer may at any time lease any Unit Ownership or any interest therein upon terms satisfactory to the Developer and no such lease shall be subject to the provisions of Paragraph A of the Article IX.

C. Attempted Leases. Any attempted lease or sublease of a Unit Ownership, beneficial interest in a Unit Ownership, or any interest therein by any person which is not made in compliance with the provisions of this Article IX shall be null and void and of no force or effect.

D. Miscellaneous. If a proposed lease of any Unit Ownership or any interest therein is made by any person after compliance with the foregoing provisions of this Article IX the lessee thereunder shall be bound by and subject to, all of the obligations of the lessor with respect to such Unit Ownership as provided in this Declaration. Any Unit Owner or beneficiary of any Unit Ownership making any such lease shall not be relieved thereby from any obligations under this Declaration.

## ARTICLE X
## DAMAGE, DESTRUCTION, CONDEMNATION
## AND RESTORAGE OF PROPERTY

A. Sufficient Insurance. In the event the improvements forming a part of the Property, or any portion thereof, including any Units, shall suffer damage or destruction from any cause and the proceeds of any policy or policies insuring against such loss of damage, and payable by reason thereof, shall be sufficient to pay the cost of repair or restoration or reconstruction, then

G:DocksandAmendmentsFolder:DeclarationlOREL8/22/01.doc

13

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

such repair, restoration or reconstruction shall be undertaken and the insurance proceeds used in payment therefore; provided, however, that in the event within one hundred and eighty (180) days after said damage or destruction, the Unit Owners shall elect either to sell the property as hereinafter provided in Article XI hereof or to withdraw the Property from the provisions of this declaration and from the provisions of the Act as therein provided, then such repair, restoration or reconstruction shall not be undertaken. The net proceeds of insurance policies shall be divided by the Board or the payee of such insurance policies shall be divided by the Board, or the payee of such insurance policies shall divide such insurance proceeds among all Unit Owners according to each Unit Owner's percentage of ownership in the Common Elements as set forth in Exhibit B attached hereto, after first paying out of the share of each Unit Owner the amount if any unpaid liens on his Unit, in the order of the priority of such liens.

B. Insufficient Insurance.

1. If the insurance proceeds are insufficient to reconstruct the Property and the Unit Owners and all other parties in interest do not voluntarily make provision for reconstruction of the property within one hundred eighty (180) days from the date of damage or destruction, then the provisions of the Act shall apply.

2. In the case of damage or other destruction in which fewer than one-half (1/2) of the Units are rendered uninhabitable, upon the affirmative vote of not fewer than three fourths (3/4ths) of the Unit Owners voting at a meeting called for that purpose, the Property shall be reconstructed. The meeting shall be held within thirty (30) days following the final adjustment of insurance claims, if any; otherwise, such meeting shall be held within ninety (90) days of the occurrence. At such meeting the Board or its representative shall present to the members present an estimate of the cost of repair of reconstruction, and the estimated amount of necessary assessments against each Unit Owner.

3. In the case of damage or other destruction, upon affirmative vote of not fewer than three fourth (3/4ths) of the Unit Owners voting at a meeting called for that purpose, any portion of the Property affected by such damage or destruction may be withdrawn from the Act. Upon the withdrawal of any Unit or portion thereof, the percentage of interest in the Common Elements appurtenant to such Unit or portion thereof, shall be reallocated among the remaining units on the basis of the percentage interest of each remaining Unit. If only a portion of a Unit is withdrawn, the percentage interest appurtenant to that Unit shall be reduced accordingly, upon the basis of diminution in market value of the Unit, as determined by the Board. The payment of just compensation or the allocation of any insurance or other proceeds to any withdrawing or remaining Unit Owner, shall be on any equitable basis, which need not be a Unit's percentage interest. Any insurance or other proceeds available in connection with the withdrawal of any portion of the Common Elements, shall be allocated on the basis of each Unit Owner's percentage interest, therein. Upon the withdrawal of any Unit or portion thereof, the responsibility for the payment of assessments on such Unit or portion thereof by the Unit Owner shall cease.

C. Eminent Domain. In the event any of the Property is taken by condemnation of eminent domain proceedings, provision for withdrawal from the provisions of the Act of such portion so taken may be made by the Board. Upon the withdrawal of any Unit or portion thereof due to eminent domain, the percentage of interest in the Common Elements appurtenant to such Unit or portion thereof shall be reallocated among the remaining Units on the basis of the percentage of interest in the Common Elements appurtenant to such Unit or portion thereof shall be reallocated among the remaining Units. If only a portion of a Unit is withdrawn, the percentage

G:DeckuandAmendmentsFolder:DeclaraionlOREL6/22/01.aoc

14

FILED DATE: 8/27/2019 11:10 AM    2019CH09898

of interest appurtenant to that Unit shall be reduced accordingly, upon the basis of diminution in market value of the Unit, as determined by the Board. The allocation of any condemnation award or other proceeds to any withdrawing or remaining Unit Owner shall be on an equitable basis, which need not be a Unit's percentage interest. Any condemnation award or other proceeds available in connection with the withdrawal of any portion of the Common Elements, shall be allocated on the basis of each Unit Owner's percentage interest therein.

D. Repair, Restoration or Reconstruction of the Improvements. As used in the Article, "repair, restoration or reconstruction" of improvements means restoring the improvements to substantially the same condition in which they existed prior to the damage or destruction, with each Unit and Common Elements having the same vertical and horizontal boundaries as before.

## ARTICLE XI
## SALE OF THE PROPERTY

At a meeting duly called for such purpose, the Unit Owners by affirmative vote of Voting Members having at least seventy-five (75%) percent of the total vote, may elect to sell the Property as a whole. Within ten (10) days after the date of the meeting at which such sale was approved, the Board shall give written notice of such action to the holder of any duly recorded mortgage or trust deed against any Unit entitled to notice under Paragraph A of Article XVIII of the Declaration. Such action shall be binding upon all Unit Owners, and it shall thereupon become the duty of every Unit Owner to execute and deliver such instruments necessary to such sale; provided, however, that any Unit Owner who did not vote in favor of such action and who has filed written objection thereto with the Board within twenty (20) days after the date of the meeting at which such sale was approved, shall be entitled to receive from the proceeds of such sale an amount equivalent to the value of his interest, as determined by an appraisal, less the amount of any unpaid assessments of charges due and owing from such Unit Owner. In the absence of agreement of an appraiser, such Unit Owner and the Board may each select a qualified appraiser, experienced in the appraisal of condominium units in the Chicago, Illinois Metropolitan Area and the two so selected, shall select a third Appraiser, experienced in the appraisal of condominium units in the Chicago, Illinois Metropolitan Area, and the fair market value as determined by a majority of the three so selected, shall control. If either party shall fail to select an appraiser, then the one designated by the other party shall make the appraisal. The cost of the appraisal shall be divided equally between such Unit Owner and the Board and the Board's share of said cost shall be a Common Expense.

## ARTICLE XII
## BY-LAWS

The provision of the following Articles XIII, XIV, XV, XVI, and XVII shall constitute the By-Laws of the Association and the By-Laws prescribed by the Act.

## ARTICLE XIII
## BOARD OF DIRECTORS

A. In General. The direction and administration of the Property shall be vested in the Board of Directors of the Association which shall consist of three (3) persons who shall be elected in the manner set forth in the By-Laws; provided, however, that notwithstanding anything to the contrary set forth in these By-Laws, during the period commencing on the date of this Declaration and ending upon the qualification of the Directors elected at the initial meeting of the Voting

G:DeclsandAmendmentsFolder:DeclarationDREL6/22/01.doc

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

Members, the Board shall consist of three (3) persons who shall be designated and selected by Developer.

(i) Each member of the Board shall be one of the Unit Owners and shall reside on the Property; provided, however, if a Unit Owner is a corporation, partnership, trust or other legal entity other than a natural person or persons, then any designated agent of such corporation, partnership, trust or other legal entity or any beneficiary of such trust shall be eligible as a member of the Board so long as such agent or beneficiary resides on the Property, and

(ii) Each member of the Board shall be in a current and paid standing with all monthly assessments and special assessments.

(iii) If a member of the Board fails to meet such qualifications during such member's term, such member shall thereupon cease to be a member of the Board and such member's place on the Board shall be deemed vacant.

B. Election of Board Members at the Initial Meeting. At the initial meeting of the Voting Members, the Voting Members shall elect the Board consisting of three (3) members. In all elections for members of the Board, each Voting Member shall be entitled to vote on a non-cumulative voting basis and the candidates receiving the highest number of votes with respect to the number of offices to be filled shall be deemed to be elected. Members of the Board elected at the initial meeting of the Voting Members shall serve until the first annual meeting of the Voting Members. At the first annual meeting three (3) Board members shall be elected. The two (2) receiving the highest number of votes at the first annual meeting shall be elected to the Board for a term of two (2) years and the one (1) person receiving the next highest number of votes shall be elected to the Board for a term of one (1) year. The election and term of office of candidates receiving the same number of votes shall be determined by lot. Upon the expiration of the terms of office of the Board members so elected at the first annual meeting and thereafter, successors shall be elected for a term of two (2) years each. The Voting Members having at least two-thirds (2/3rds) of the total votes may from time to time increase or decrease the term of office and the number of Board members at any annual or special meetings provided that (i) such number shall not be less than three (3), (ii) the terms of at least one-third (1/3rd) of the persons on the Board shall expire annually, and (iii) no Board member of office shall be elected for a term of more than two years but Board Members or officers may succeed themselves. Members of the Board (including without limitation those members designated by the Developer) shall receive no compensation for their services. Vacancies in the Board, including vacancies due to any increase in the number of persons on the board, shall be filled by a majority vote of the remaining Board members thereof, except that of a vacant position of the Board last filled by a person appointed by the Developer. Any director so elected or appointed to fill a vacancy shall hold office for a term equal to the unexpired term of the director he succeeds. Except as otherwise provided in this Declaration, the Property shall be managed by the Board and the Board shall act by majority vote of those present at its meeting when a quorum exists. Meeting of the Board may be called, held and conducted in accordance with such regulations as the Board may adopt provided, however, that (i) each Unit Owner shall be entitled to notice in the same manner as provided in these By-Laws of any meeting of the Board called for the purpose of considering the adoption of the proposed annual budget or any increase or establishment of an assessment, and (ii) the Board shall meet no less than four (4) times a year. A majority of the total number of members on the Board shall constitute a quorum.

C. <u>Officers.</u> The Board shall elect from among its members for the term of one (1) year (i) a President who shall preside over both its meeting and meeting of the Voting Members, and who shall be the chief executive officer of the Board and the Association and who shall be designated to mail and receive all notices and execute all amendments hereto on behalf of the Board or the Association as provided herein and in the Act, (ii) a Secretary who shall keep the minutes of all meetings of the Board and Meetings of the Voting Members and who shall in general, perform all the duties incident to the office of the Secretary, (iii) a Treasurer to keep the financial records and books of account, and (iv) such additional officers as the Board shall see fit to elect. Vacancies in any office shall be filled by the Board by a majority vote of the remaining members thereof at a special meeting of the Board. Any director elected to fill a vacancy shall hold office for a term equal to the unexpired term of the officer he succeeds. Any officer may be removed for cause at any time by a vote of two thirds (2/3rds) of the total membership of the Board at a special meeting thereof.

D. <u>Removal.</u> Except for directors designated by Developer any Board member may be removed from office, at any time after the affirmative vote of the Voting Members having at least two-thirds (2/3rds) of the total votes, at any special meeting called for that purpose.

E. <u>Notice to Members of Board Meeting.</u> Written notice stating the place, date and hour of any meeting of the Board shall be delivered to each member of the Board not less than five (5) days prior to the date of such meeting. The purpose for which the meeting is called shall be stated in the notice. The Board shall meet at least four (4) times annually on dates determined at the initial and annual meetings of the Voting Members in the absence of such determination, then meetings of the Board shall be held on the third Monday of February, May, August, and November, and at such other times as the Board deems necessary.

F. <u>Notice to Unit Owners.</u> All meetings of the Board of Managers shall be open to any Unit Owner, except for the portion of any meeting held (i) to discuss litigation when as action on or on behalf of the association has been filed and is pending in a court or administrative tribunal, or when the Board of Managers finds that such an action is probable or imminent, (ii) to consider information regarding appointment, employment or dismissal of an employee, or (iii) to discuss violations of rules and regulations of the association or a Unit Owner's unpaid share of common expenses; that any vote on these matters shall be taken at a meeting or portion thereof open to any Unit Owner; that notice of such meetings shall be mailed or delivered at least 48 hours prior thereto, unless a written waiver of such notice is signed by the person or persons entitled to such notice before the meeting is convened; and that copies of notices of meetings of the Board of Managers shall be posted in entrance ways, or other conspicuous places on the condominium property at least 48 hours prior to the meeting of the Board of Managers.

G. <u>Delivery of Documents by Developer.</u> Within sixty (60) days following the election of the Board. The Developer shall deliver to the Board the following:

1. All original documents as recorded or filed relating to the Property, its administration and the Association, such as this Declaration, the Articles of incorporation for the Association, if any, the minute book of the Association and rules and regulations governing the Property;

2. A detailed accounting by the Developer setting forth the source and nature of receipts and expenditures in connection with the management, maintenance and operation of the Property;

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

3. Funds on hand held in a segregated account of the Developer for the Association; and

4. A schedule of all personal property, equipment, and fixtures owned by the Association, including documents such as invoices or bills of sale, if available, evidencing transfer of title to such property.

H. General Powers of the Board.   The powers and duties of the Board shall be those enumerated in the Act and shall include, but shall not be limited to, the following matters:

1. Operation, care, upkeep, maintenance, replacement, and improvements of the Common Elements as the Board shall determine to be necessary and proper;

2. Preparation, adoption, and distribution of the annual budget for the Property;

3. Levying of assessments;

4. Collection of assessments from Unit Owners;

5. Employment and dismissal of the personnel necessary or advisable for the maintenance and operation of the Common Elements;

6. The Board or its agent shall have the authority to and shall obtain adequate and appropriate kinds of insurance;

7. Owning, conveying, encumbering, leasing and otherwise dealing with Units conveyed to or purchased by it;

8. Adoption and amendment of rules and regulations covering the details of the operation and use of the Property, after a meeting of the Unit Owners called for the specific purpose of discussing the proposed rules and regulations, notice of which contains the full text of the proposed rules and regulations and which conforms to the requirements of Section 18(b) of the Act;

9. Keeping of detailed, accurate records of the receipts and expenditures affecting the use and operation of the Property;

10. Having access to each Unit from time to time as may be necessary for the maintenance, repair or replacement of any Common Elements therein or accessible therefrom, or for making emergency repairs therein necessary to prevent damage to the Common Elements or to other Unit or Units and having access to specific units when necessary to start up, maintain or turn off the Common Area sprinkler systems.;

11. To pay for water, waste and refuse removal, electricity, and other necessary utility service for the Common Elements as the Board shall determine to be necessary and proper;

12. To pay for landscaping, gardening, snow removal, painting, cleaning, tuckpointing, maintenance, decorating, repair and replacement of the Common Elements including but  not limited to private driveways, parking spaces, balconies and patios, landscaping

fences and walls if any, and such furnishings and equipment for the Common Elements, all as the Board shall determine are necessary and proper, and the Board shall have the right and duty to acquire the same for the Common Elements;

13. To pay for any materials, supplies, furniture, labor, services, maintenance, repairs, structural alterations or assessments which the Board is required to secure or pay for pursuant to the terms of this Declaration or By-Laws of which, in its opinion, shall be necessary or proper for the maintenance and operation of the Property, as a first-class condominium development or for the enforcement of the Board's rules and regulations;

14. To pay any amount necessary to discharge any mechanic's lien or other encumbrance against the Property or any part thereof which first arises after the date of this Declaration and which may, in the opinion of the Board, constitute a lien against the property or against the Common Elements, rather than merely against the interests therein of particular Unit Owners. Where one or more Unit Owners are responsible for the existence of such lien, they shall be jointly and severally liable for the cost of discharging it and any costs incurred by the Board by reason of said Lien of liens shall be specifically assessed to said Unit Owners;

15. To maintain and repair any Unit if such maintenance or repair is necessary, in the discretion of the Board, to protect the Common Elements or any other portion of the Property, if the Unit Owner of such Unit has failed or refused to perform said maintenance or repair within a reasonable time after written notice of the necessity of said maintenance or repair is mailed or delivered by the Board to said Unit Owner, provided that the Board shall levy a special assessment against such Unit Owner for the cost of said maintenance or repair which specifically could include damage to landscaping caused by a Unit Owner's refusal to cooperate with the start up, maintenance or shut down of the Common Area landscape sprinkler system;

16. The Board or its agent, upon reasonable notice, may enter any Unit when necessary in connection with any maintenance or construction for which the Board is responsible. Such entry shall be made with as little inconvenience to the Unit Owner as practicable, and any damage caused thereby shall be repaired by the Board as a Common Expense;

17. The Board's powers hereinabove enumerated and described in this Declaration shall be limited in that the Board shall have no authority to acquire and pay for any structural alterations, additions to, or improvements of the Common Elements (other than for purposes of replacing or restoring portions of the Common Elements in accordance with the provisions of this Declaration) requiring as expenditure in excess of Twenty Thousand ($20,000.00) Dollars without in each case the prior approval of Voting Members having two thirds (2/3rds) of the total vote;

18. All agreements, contracts, deeds, leases, vouchers, for payment of expenditures and other instruments shall be signed by such officer or officers or agent or agents of the Board and in such manner as from time to time shall be determined by written resolution of the Board. In the absence of such determination by the Board, such documents shall be signed by the Treasurer and countersigned by the President of the Board;

19. The Board may adopt such reasonable rules and regulations which are not inconsistent with this Declaration and which the Board deems advisable for the maintenance, administration, management, operation, use, conservation, and beautification of the property, including the Common Elements, and for the health, comfort, safety, and general welfare of the Unit Owners and Occupants. Written notice of such rules and regulations shall be given to all Unit

G:DeckusandAmendmentsFolder:DeclarationIORELt6/22/01.doc

19

Owners and Occupants, and all Unit Owners and Occupants shall at all times be subject to and comply with such rules and regulations and the entire property shall at all times be maintained subject to such rules and regulations;

20. The Board may engage the services of an agent to manage the Property to the extent deemed advisable by the Board and the Board may retain the services of an accountant and attorney of its choice;

21. Nothing hereinabove contained shall be construed to give the Board, the Association, or the Unit Owners authority to conduct as active business for profit on behalf of all the unit Owners or any of them; and

22. Upon authorization by a two thirds (2/3rds) vote of the Board or by the affirmative vote of not less than a majority of the Voting Members at a meeting of all Unit Owners, shall have the power to seek relief from or in connection with the assessment, or levy of any real property taxes or charges of the State of Illinois of any political subdivision thereof, or any other lawful taxing or assessing body, which are authorized by law to be assessed and levied on real property and to charge and collect all expenses incurred in connection therewith as Common Expenses.

### ARTICLE XIV
### MEMBERS
### (UNIT OWNERS)

A. Voting Rights. There shall be one person with respect to each Unit Ownership who shall be entitled to vote at any meeting of the Unit Owners. Such Voting Member shall be the Unit Owner or one of the Persons included in the Unit Ownership or the beneficiary or one of the beneficiaries of a land trust which is a Unit Owner of some person (who need not be a Unit Owner) designated by such Unit Owner as beneficiary or beneficiaries to act as proxy on behalf of such Unit Owner or beneficiary or beneficiaries. Such designation shall be made in writing to the Board and shall be revocable at any time by actual notice to the Board of the death or judicially declared incompetence of any designator or by written notice to the Board by the Unit Owner. Any or all of the Persons included in the Unit Owner of Unit Ownership, and their designee, if any, may be present at any meeting of the Voting Members, but only the Voting Member of the Unit Ownership may vote or take any other action as a Voting Member either in person or by proxy. The total number of votes of all Voting Members shall be 100, and each Unit Owner shall be entitled to the number of votes equal to the total of the percentage of ownership in the Common Elements applicable to such Unit Owner's Unit Ownership as set forth in Exhibit B attached hereto. The Developer shall designate the Voting Member with respect to any Unit Ownership owned by the Developer. The Association may, upon adoption of the appropriate rules by the Board of Managers, conduct elections by secret ballot whereby the voting ballot is marked only with the percentage interest for the unit and the vote itself, provided the Board further adopt rules to verify the status of the unit owner issuing a proxy or casting a ballot. The Association shall have one class of membership among the Unit Owners.

B. Quorum. Meetings of the Voting Members shall be held at the property or such other place in Cook County, Illinois, as may be designated in any notice of a meeting. The presence in person or by proxy at any meeting of the Voting Members having twenty-five (25%) percent of the total votes shall constitute a quorum. Unless otherwise expressly provided herein, any action may

G:DeclsandAmendmentsFolder\Declaration\ORELB/22/01.doc

20

FILED DATE: 8/27/2019 11:10 AM    2019CH09898

be taken at any meeting of the Voting Members at which a quorum is present upon the affirmative vote of the Voting Members having a majority of the total votes represented at such meeting.

C. Initial and Annual Meeting. The initial meeting of the Voting Members shall be held upon not less than twenty-one (21) or more than thirty (30) days written notice given by the Developer, but in any event, the initial meeting of the Voting Members shall be held no later than sixty (60) days after the conveyance by the Developer of 75% of the Units or three (3) years after the recording of the Declaration, whichever is earlier; provided, however, (i) the words "75% of the Units" as used in the preceding clause of this sentence shall mean 75% of the sum of the Units listed on Exhibit B attached hereto, plus all of the Units which Developer contemplated constructing on the Additional Land and adding to the Property pursuant to one or more Amendments to the Condominium Declaration described in Article XIX of this Declaration.

D. Special Meetings. Special meetings of the Voting Members may be called at any time for the purpose of considering matters, which by the terms of this Declaration, require the approval of all or some of the Voting Members, or for any other reasonable purpose. Said meetings shall be called by written notice, authorized by the President of the Board, a majority of the Board, or by the Voting Members having 20% of the total votes and delivered to the President or Secretary of the Board, not less than ten (10) days or more than thirty (30) days prior to the date fixed for said meeting. The notice shall specify the date, time, and place of the meeting, and the matters to be considered. Matters to be submitted at special meetings of the Voting Members shall first be submitted to the Board, at least ten (10) days prior to the special meeting, who shall then submit the matters to the Voting Members.

E. Notices of Meetings. Notices of meetings required to be given under this Declaration may be delivered either personally or by mail to the person entitled to vote, addressed to each such person at the address given by such person to the Board for such purpose of service of such notice, or to the Unit of the Unit Owner with respect to which such voting rights relates, if no address has been given to the Board, provided that any such notice shall be delivered no less than ten (10) days and no more than thirty (30) days prior to the date fixed for such meeting and such notice shall state the time, date, place and purpose of such meeting.

F. Miscellaneous. No merger or consolidation of the Association, no sale, lease, exchange, mortgage, pledge, or other disposition of all, or substantially all of the property and assets of the Association, and no purchase or sale of land or of Units on behalf of all Unit Owners shall be valid unless there is an affirmative vote of two-thirds (2/3rds) of the votes of Unit Owners, unless a greater percentage is otherwise provided for in this Declaration. At any time, in the event that thirty (30%) percent or less of the total number of Units control in excess of fifty (50%) percent of the total votes of the Association, any provision in this Declaration which requires a vote by Unit Owners holding a certain percentage of the total vote shall require, in lieu thereof, the percentage of the votes allocable to Units pursuant to their respective percentage of ownership in the Common Elements.

ARTICLE XV
ASSESSMENTS-MAINTENANCE FUND

A. Estimated Annual Budget and Assessments. Each year, at least sixty (60) days prior to the Association's year end, the Board shall estimate the total amount necessary to pay the costs of all Common Expenses which will be required during the ensuing calendar year for the rendering of all services, together with a reasonable amount considered by the Board to be

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

necessary for a reserve for contingencies and replacements. The annual budget shall set forth with particularity all anticipated Common Expenses by category as well as all anticipated assessments and other income. The budget shall also set forth each Unit Owner's proposed common expense assessment. Each Unit Owner shall receive at least thirty (30) days prior to the adoption thereof by the Board, a copy of the proposed annual budget. The annual budget shall also take into account the estimated net available cash income for the year from the operation or use of the Common Elements, if any. The "Estimated annual budget" shall be assessed to the Unit owners according to each Unit Owner's percentage of ownership in the Common Elements as set forth in Exhibit B attached hereto. Each Unit Owner shall receive notice in the same manner as is provided in this Declaration for membership meetings of any meeting of the Board concerning the adoption of the proposed annual budget or any increase of establishment of an assessment and said meeting of the Board shall be open to all Unit Owners. On or before January 1 of the ensuing year, and the first of each and every month of said year, each Unit owner jointly and severally shall be personally liable for and obligated to pay to the Board or as the Board may direct, one-twelfth (1/12th) of the assessment against such Unit Owner's Unit Ownership made pursuant to this paragraph. On or before April of each calendar year following the year in which the initial meeting is held, the Board shall supply to all Unit Owners an itemized accounting of the Common Expenses for the preceding year actually incurred and paid, together with a tabulation of the amounts collected pursuant to the budget or assessments, and showing the net excess or deficit of the amount required for actual expenses and any surplus shall be credited according to each Unit Owner's percentage of ownership in the Common Elements to the next monthly installments due from Unit Owners under the current year estimate, until exhausted, and any net shortage shall be added according to each Unit Owner's percentage of ownership in the Common Elements to the installments due in the succeeding six (6) months after rendering of the account.

B. <u>Reserves and Adjustments.</u> The Board shall establish and maintain a reasonable reserve for contingencies and replacements. Separate assessments for expenditures relating to emergencies of mandated by law may be adopted by the Board of managers without being subject to unit owner approval or the subsequent provisions herein. An "emergency" as used herein means as immediate danger to the structural integrity of the common elements or to the life, health, safety or property of the unit owners. Assessments for additions and alterations to the common elements or to association-owned property, which are not an emergency and which are not included in the adopted annual budget, shall be separately assessed and are subject to the approval of two-thirds of the total vote of all unit owners. Any other extraordinary or non-recurring common expense not set forth in the budget as adopted shall be separately assessed against all unit owners and are subject to the approval of two-thirds of the total vote of all unit owners. The Board of managers may adopt separate assessments payable over more than one fiscal year. All Unit Owners shall be personally liable for and obligated to pay their respective adjusted monthly amount.

C. <u>Initial Budget.</u> The initial Board appointed by the Developer shall determine and adopt, prior to the conveyance of the first Unit hereunder, the "estimated annual budget" for the initial period commencing with the first day of the month in which the sale of the first Unit is closed and ending on December 31 of the calendar year in which such sale occurs and shall continue to determine the "estimated annual budget" for each succeeding calendar year until such time as the first Board elected hereunder takes office. Assessments shall be levied against the Unit Owners during said periods as provided in Paragraph A, of this Article.

G:DecksandAmendmentsFolder:DeclarationfOREL6/22/01.doc

D. Failure to Prepare Estimates. The failure or delay of the Board to prepare or deliver the annual or adjusting estimate to the Unit Owner shall not constitute a waiver or release in any manner of such Unit Owner's obligation to pay the maintenance costs and necessary reserves, as herein provided, whenever the same shall be determined. In the absence of any annual estimate or adjusted estimate, the Unit Owner shall continue to pay the monthly maintenance charge at the existing monthly rate established for the previous period until a new monthly maintenance payment is received which shall be due not more than ten (10) days after such new annual adjusted estimate shall have been mailed or delivered.

E. Books and Records. The Board shall keep full and accurate books of accounts in chronological order of the receipts and expenditures affecting the Common Elements, specifying and itemizing the maintenance and repair expenses of the Common Elements, and any other expenses incurred by the Board. Such records and the vouchers authorizing the payments shall be available for inspection by any Unit Owner or any representative of a Unit Owner duly authorized in writing, at such reasonable time or time during normal business hours as may be requested by the Unit Owner. Upon ten (10) days notice to the Board and payment of a reasonable fee, any Unit Owner shall be furnished a statement of this account setting forth the amount of any unpaid assessments or other charges due and owing from such Unit Owner.

F. Use of Funds. All funds collected hereunder shall be held and expended for the purpose designated herein, and (except for such special assessments as may be levied hereunder against less than all the Unit owners and for such adjustments as may be required to reflect delinquent or prepaid assessments) shall be deemed to be held for the benefit, use and account of all the Unit Owners in the percentages set forth in Exhibit B attached hereto.

G. Insurance. Any insurance premiums assessed on a basis reflecting increased charges for coverage on certain Units shall be assessed to such Unit.

H. Assessments. If a Unit Owner is in default in the monthly payment of the aforesaid charges or assessments for thirty (30) days, the members of the Board may bring suit for and on behalf of themselves and as representatives of all Unit Owners, to enforce collection thereof or to foreclose the lien therefore as hereinafter provided; and there shall be added to the amount due to the costs of said suit and other fees and expenses together with interest and reasonable attorney's fees to be fixed by the Court. To the extent permitted by any decision or any statute or law now or hereafter in effect, the amount of any delinquent and unpaid charges or assessments, and interest, costs, and fees as above provided, shall be and become a lien or charge against the Unit Ownership of the Unit Owner, involved when payable and may be foreclosed by an action brought in the name of the Board as in the case of foreclosure of liens against real estate. Such lien shall take effect and be in force when and as provided in the Act; provided, however, that encumbrances owned or held by any bank, insurance company, savings and loan association, or other lender shall be subject as to priority after written notice to said encumbrancer of unpaid Common Expenses only to the lien of all Common Expenses on the encumbered Unit Ownership which became due and payable subsequent to the date the encumbrancer either takes possession of the Unit, accepts a conveyance of any interest in the Unit Ownership (except as security) or has a receiver appointed in a suit to foreclose its lien. In addition to the foregoing, the Board or its agents shall have such other rights and remedies to enforce such collection as such otherwise be provided or permitted by law from time to time. Without limiting the generality of the foregoing, if any Unit Owner shall fail to pay the proportionate share of the Common Expenses or of any other expenses required to be paid hereunder when due, such rights and remedies shall include: (i) the right to enforce the collection of such defaulting Unit Owner's share of such

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

expenses, together with interest thereon, at the maximum rate permitted by law, and all fees and costs (including reasonable attorney's fees) incurred in the collection thereof; (ii) the right to take possession of such defaulting Unit Owner's interest in the Property, to maintain for the benefit of all the other Unit Owners an action for possession in the manner prescribed in "an Act in regard to Forcible Entry and Detainer", approved February 16, 1874, as amended, and to execute leases of such defaulting Unit Owner's interest in the Property and apply the rents derived therefrom against such expenses.

I.  Nonuse.  No Unit Owner may waive or otherwise escape liability for the assessments provided for herein by nonuse of the Common Elements or abandonment of his Unit.

### ARTICLE XVI
### COVENANTS AND RESTRICTIONS AS TO USE AND OCCUPANCY

The Units and Common Elements shall be owned, occupied and used subject to the following covenants and restrictions:

A.  General Use.  Each Unit shall be used exclusively for residential purposes and no such Unit shall (without the prior written consent of the Board) be occupied for sleeping quarters by more than six (6) persons.  A garage shall not be occupied for sleeping quarters.

B.  Obstruction of Common Elements and Unit Maintenance.  There shall be no obstruction of the Common Elements nor shall anything be stored in the Common Elements without prior consent of the Board except as herein expressly provided.  Each Unit Owner shall be obligated to maintain and keep in good order and repair his own Unit and the Limited Common Elements, if any, adjoining his Unit.

C.  Prohibited Use.  Nothing shall be done or kept in any Unit, or in the Common Elements, which will increase the rate of insurance on any of the Buildings or contents thereof, without the prior written consent of the Board.  No Unit Owner shall permit anything to be done or kept in his Unit, or in the Common Elements which will result in the cancellation of insurance on any of the Buildings, or contents thereof, or which would be in violation of any law.  No waste shall be left in the Common Elements.  No Unit Owner shall overload the electric wiring in any of the Buildings or operate any machines, appliances, accessories, or equipment in such a manner as to cause, in the judgment of the Board, an unreasonable disturbance to others, or connect any machines, appliances, accessories, or equipment to the common heating or plumbing system, without the prior written consent of the Board.

D.  Unit Owner Insurance.  Each Unit Owner shall be responsible for his own insurance on his personal property in his own Unit, his personal property, if any, stored elsewhere on the Property and his personal liability insurance.

E.  Exterior Attachments.  Unit Owners shall not cause or permit anything to be placed on the outside walls, roof, patio, or balconies, if any, of any of the buildings and no sign, awning, canopy, shutter, radio, barbecue grill, television antenna, or such other apparatus shall be affixed to or placed upon the exterior walls, roof, patios, or balconies, if any, of and such Buildings, or any part thereof, without prior written consent of the Board, provided, however, a Unit Owner may place an unattached-free standing barbecue grill on a patio or balcony, if any, which is designated herein for the exclusive use of such Unit Owner.  The Board cannot deny permission to attach a

G:Deeds and Amendments Folder:Declaration:OREL6/22/01.doc

satellite dish upon the exterior of the Unit Owner's specific Unit, but the Board may require that the Unit Owner be responsible for any repair if damage is caused by such installation or use. Insurance on any such satellite dish would be the Unit Owner's responsibility.

F. Window Treatment, Interior Signs and Sound Conditioning. The use and the covering of the interior surfaces of the glass windows and/or doors appurtenant to the Units, whether by draperies, shades, or other items visible from the exterior of any of the Buildings, shall be subject to the rights and regulations of the Board. Unit owners shall not cause or permit any sign, advertising or other display to be placed inside the Unit in such a way so that it is visible from the exterior of the Unit or Building. In order to enhance the sound conditioning or the Building, the Board may specify minimum standards for the floor and wall coverings of all Units. No apparatus which amplifies sound will be permitted to be installed in, attached to, or built into walls common with another Unit.

G. Pets. No animals, reptiles, rabbits, livestock, fowl or poultry of any kind shall be raised, bred, or kept in any Unit or in the Common Elements, except that dogs, cats or other usual household pets may be kept in Units, subject to rules and regulations adopted by the Board, provided that they are not kept, bred, or maintained for any commercial purpose and that they are not more than one (1) in number and not more than thirty-five (35) pounds in weight; and provided further that any such pet causing or creating a nuisance or unreasonable disturbance shall be permanently removed from the property upon three (3) days written notice from the Board. The Board may restrict pets from access to any portion of the Common Elements, and may designate other portions of the Common Elements to accommodate the reasonable requirements of Unit Owners who keep pets. Owners shall be required to clean up after their pets. Unit owners may keep birds and aquariums, without limitation as to number and weight, provided that these creatures are not kept for commercial purposes.

H. Nuisances. No noxious or offensive activity shall be carried on in any Unit or in the Common Elements, nor shall anything be done therein, either willfully or negligently, which may be or become an annoyance or nuisance to the other Unit Owners or Occupants. In particular, the following shall be considered noxious and offensive activity: the use of apparatus in any Unit or in the Common Elements, which amplifies sound in a manner so that the amplified sound can be heard by other Unit Owners or Occupants; the repairing of any vehicle in the Common Elements; the use of any vehicle in the Common Elements without a muffler; the screeching of brakes, the sounding of a car alarm longer than a few minutes, the leaking of oil in either the garage or parking lot. Also considered a nuisance is the use or placement of any vehicle in the Common Elements other than on roads and/or driveways designed for that purpose. An inoperable vehicle will not be allowed to be left in the Common Elements, without permission of the Board. Any vehicle not displaying proper registration tags, license plates or having flat or no tires will be considered abandoned and towed at the owner's expense.

I. Unsightliness. No cloths, sheets, blankets, laundry, or any kind of other articles shall be hung out or exposed on any part of the Common Elements. No trucks, vans, recreation vehicles, boats, motorcycles, or similar vehicles shall be stored or parked in the Common Elements, but may be kept inside garages. The foregoing restriction shall not apply to mini-vans or sport utility vehicles. The Common Elements shall be kept free and clear of rubbish, debris, and other unsightly materials.

J. Commercial Activities. Except as may be provided by the Board in writing, no industry, business, trade, occupation, or profession of any kind, commercial, religious, educational, or

G:DeclsandAmendmentsFolder:DeclarationsORELB/22/01.doc

25

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

otherwise, designated for profit, altruism, exploration, or otherwise, shall be conducted, maintained, or permitted in any Unit.

K. "For Sale" and "For Rent" Signs. No "For Sale" or "For Rent" signs, advertising or other displays shall be maintained or permitted on any part of the Property except at such location and in such form, as shall be determined by the Board; provided that the right is reserved by the Developer, and its agents, to maintain on the Property until the sale of the last Unit, all models, sales offices, and advertising signs, banners and lighting in connection therewith, at such locations and in such forms as the Developer shall determine, together with access through the Common Elements in favor of the Developer, its agents, licensees, designees, and its prospective purchasers and lessees.

L. Common Elements. Nothing shall be altered or constructed in or removed from the Common Elements, except upon the written consent of the Board, or otherwise in accordance with rules and regulations adopted by the Board.

M. Exceptions. The Unit restrictions in Paragraph A and L of this Article shall not, however, be construed in such a manner as to prohibit a Unit Owner from: (i) maintaining his professional library therein, (ii) keeping his personal business or professional records or accounts therein, or (iii) handling his personal business or professional telephone calls or correspondence therefrom. Such uses are expressly declared customarily incident to the principal residential use and not in violation of such Paragraphs A and L of this Article.

N. Reservations by the Developer. Notwithstanding anything to the contrary in this Declaration:

1. Structural changes and alterations may be made by the Developer in Units and Common Elements used by the Developer or its agents as model apartments and/or sales and marketing areas, as may be reasonably necessary in the Developer's opinion to adapt the same to such uses. Such changes may include the elimination or alteration of perimeter walls for the purpose of combining adjoining Units or improving access thereto or visibility thereof; and

2. The Developer and its agent further reserve the right at all times to use unsold Units and Common Elements for storage, office, sales, models, transient parking and related purposes until all Units listed on Exhibit B attached hereto, and all Units which the Developer desire to construct, have been sold.

O. Cable Television. Upon the affirmative vote of more than fifty percent (50%) of the unit Owners at a meeting of Unit Owners duly called for such purpose, the Board shall be authorized to grant an easement of license for the laying or other installation of cable television cable. The grant of such easement or license shall be according to the terms and conditions of the local ordinance providing for cable television in the municipality.

P. Conflict of Interest. The Board may not enter into a contract with a current board member or with a corporation or partnership in which a board member has 25% or more interest unless notice of intent to enter the contract is given to Unit Owners within 20 days after a decision is made to enter into the contract and the Unit Owners are afforded an opportunity by filing a petition, signed by 20% of the Unit Owners, for an election to approve or disapprove the contract. Such petition shall be filed within 20 days after such notice and such election shall be held within 30 days after filing the petition.

G:DecksandAmendmentsFolder\Declaration\OREL\8/22/01.doc

Q. Separate Real Estate Taxes. It is understood that real estate taxes are to be separately taxed to each Unit Owner for his Unit and his corresponding percentage of ownership in the Common Elements, as provided in the Act. In the event that for any year such taxes are not separately taxed to each Unit Owner, but are taxed on the Property as a whole, then each Unit Owner shall pay his proportionate share thereof in accordance with his respective percentage of ownership interest in the Common Elements.

R. Parking Area. The Board may determine rules and regulations with regard to the outside Parking Area, keeping in mind the necessity for guest parking.

ARTICLE XVII
REMEDIES FOR BREACH OF COVENANTS
RESTRICTIONS AND REGULATIONS

A. Abatement and Enjoinment. The violation of any restriction or condition or regulation adopted by the Board, or the breach of any covenant or provision contained in this Declaration shall give the Board the right, in addition to the rights set forth in the next succeeding Paragraph and elsewhere in this Declaration: (i) to enter upon that part of the property where such violation or breach exists and summarily abate and remove, at the expense of the defaulting Unit Owner, any structure, thing or condition that may exist thereon contrary to the intent and the provisions hereof, and the Developer, or successors or assigns, or the Board, or its agents, shall not thereby be deemed guilty in any manner of trespass, or (ii) to enjoin, abate, or remedy by appropriate legal proceeding, either at law or in equity, the continuance of any breach. All expenses of the Board in connection with such actions or proceedings, including court costs and attorneys fees and expenses, and all damages, liquidated or otherwise, together with interest thereon at the rate of twelve percent (12%) per annum until paid, shall be charged to and assessed against such defaulting Unit Owner and upon all of his additions and improvements thereto and upon all his personal property in his Unit or located elsewhere on the Property. Any and all of such rights and remedies may be exercised at any time and from time to time, cumulatively or otherwise, by the Board.

B. Involuntary Sale. If any Unit Owner (either by his own conduct or by the conduct of any occupant of his Unit) shall violate any of the covenants or restrictions or provisions of this Declaration, or the regulations adopted by the Board, and such violation shall continue for thirty (30) days after notice in writing from the Board, or shall re-occur more than once after such notice, then the Board shall have the power to issue to the defaulting Unit Owner a ten (10) day notice in writing to terminate the rights of said defaulting Unit Owner to continue as a Unit Owner. Any action in equity may be filed by the members of the Board against the defaulting Unit Owner for a decree of mandatory injunction against such Unit Owner or, in the alternative, for a decree declaring the termination of the defaulting Unit Owner's right to occupy, use, or control the Unit owned by such Unit Owner on account of the said violation, and ordering that the right, title, and interest of the Unit Owner in the Property shall be sold (subject to the lien of any existing mortgage) at a judicial sale. Upon such notice and terms as the court shall establish, except that the court shall enjoin and restrain the defaulting Unit Owner from re-acquiring such Unit Owner's interest in the Property at such judicial sale. The proceeds of any such judicial sale shall first be paid to discharge court costs, court reporter charges, reasonable attorney's fees and all other expenses of the proceeding and sale, and all such items shall be taxed against the defaulting Unit Owner in said decree. Any balance of proceeds, after satisfaction of such charges and satisfaction of any unpaid assessments hereunder or any liens, shall be paid to the Unit Owner.

Upon the confirmation of such sale, the purchaser there at shall thereupon be entitled to a deed to the Unit Ownership and to immediate possession of the Unit sold and may apply to the court for writ of assistance for the purpose of acquiring such profession, and it shall be a condition of any such sale, and the decree shall provide, that the purchaser shall take interest in the Property sold subject to this Declaration.

## ARTICLE XVIII
## GENERAL PROVISIONS

A. Notice to Mortgagees.   Upon written request to the Board, the holder of any duly recorded mortgage or trust deed against any Unit Ownership shall be given a copy of any or all notices permitted or required by this Declaration to be given to the Unit Owner whose Unit Ownership is subject to such mortgage or trust Deed.

B. Notice to Board, Association and Unit Owners.   Notices provided for in this Declaration and in the Act shall be in writing. Notices to a Unit Owner may be delivered to such Unit Owner personally or by mail addressed to such Unit Owner's Unit. Notice to the Board or the Association may be personally delivered to any member of the Board or officer of the Association or mailed to such member or officer at such member's or officer's Unit. The Association or Board may designate a different address or addresses for notices to them, respectively, by giving written notice of such address change to all Unit Owners. Any Unit Owner may also designate a different address for notices to such Unit Owner by giving written notice of such Unit owner's change of address to the Board or Association. Notices addressed and mailed to the Board or Association as above shall be deemed delivered when mailed by United States registered or certified mail. Notices addressed and mailed to a Unit Owner shall be deemed delivered when such notice is deposited in such Unit Owner's mailbox. During the time the Developer elects the Board of the Association, notices provided for in the Declaration and in the Act shall be in writing, and shall be addressed to the Board of Association, or Unit Owner, as the case may be at:

Lorel Condo Association
C/O Hartz Construction Co., Inc.
8995 West 95th Street
Palos Hills, Illinois 60465

C.   Notice to Decedent.   Notices required to be given any devisee or personal representative of a deceased Unit Owner may be delivered either personally or by mail to such party at his or hers address appearing in the records of the court wherein the estate of such deceased Unit Owner is being administered.

D. Binding Effect.   Each grantee of the Developer and each subsequent grantee by acceptance of a deed of conveyance, and each purchaser under any contract for such deed of conveyance, and each tenant under a lease for a Unit accepts the same subject to all restrictions, conditions, covenants, reservations, liens and charges, and the jurisdiction, rights and powers created or reserved by this Declaration, and all rights, benefits and privileges of every character hereby granted, created, reserved, or declared, and all impositions and obligations hereby imposed shall be deemed and taken to be covenants running with the land, and shall bind any Person having at any time any interest or estate in the Property or in any Unit, and shall inure to the benefit of such Unit Owner in like manner as though the provisions of this Declaration were recited and stipulated at length in each and every deed of conveyance.

G:DeckaandAmendmentsFolder:DeclarationlOREL6/22/01.doc

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

E. <u>Waiver.</u>  No covenants, restrictions, conditions, obligations or provisions contained in this Declaration shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

F. <u>Amendment, Change, Modification, or Rescission.</u>  No provision of this Declaration affecting or creating any of the rights, options, privileges or duties of the Developer (including without limitation the provisions of Article XII of this Declaration and the provisions of the following Paragraph G) may be amended, changed, modified or rescinded in any way without the prior written consent of the Developer.  The provisions of this Paragraph F may only be amended, changed, modified or rescinded by an instrument in writing setting forth such amendment, change, modification or rescission and signed, acknowledged, and approved by the Board, the Developer and all of the Unit Owners and all mortgagees having bona fide liens of record against any of the Unit Ownerships.  Except for amendments made pursuant to the provisions of Article XII of this Declaration (which amendments shall only require the signature of the Developer) and except for amendments made pursuant to the provisions of the following Paragraph G (which amendments shall only require the signature of the Developer)  and except for amendments to this Paragraph F, and except as elsewhere provided in this Declaration, and except as for provided in the Act, the provisions of this Declaration may only be amended, changed, modified or rescinded by an instrument in writing setting forth such amendment, change, modification or rescission and signed and signed and acknowledged by the Board and approved by the Unit Owners having at least two-thirds (2/3rds) of the total vote at a meeting called for that purpose and approved by any mortgagees required under the Condominium Instruments and containing an affidavit by an officer of the Board certifying that a copy of such instrument (without such affidavit) has been mailed by certified mail to all mortgagees having bona fide liens of record against any Unit not less than ten (10) days prior to the date of such affidavit.  Each instrument of amendment, change, modification, or rescission made in accordance with this Declaration shall be effective upon the recording or registration of such instrument in the office of the Cook County Recorder of Deeds.

G. <u>Special Amendment.</u>  Notwithstanding any other provision of this Declaration, the Developer singly reserves and shall have the right at any time and from time to time to make and record a Special Amendment to this Declaration  (i)  to comply with requirements of the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Federal Housing Association, the Veteran's Administration, or any other governmental agency or any other public, quasi-public or private entity which performs (or may in the future perform) functions similar to those currently performed by such entities,  (ii)  to induce any of such agencies or entities to  make, purchase, sell, insure, or guarantee first mortgages covering Unit Ownerships,  (iii)  to bring this Declaration into compliance with the Act,  (iv)  to correct clerical or typographical errors in this Declaration or any Exhibit hereto or any supplement or amendment thereto, or  (v)  to complete the data on the Plat after improvements constructed at any time on the Parcel are completed by the Developer.  In furtherance of the foregoing, each Unit Owner and each holder of a mortgage, trust deed, or lien affecting any Unit and each Person having any other interest in the Property hereby grants to the Developer an irrevocable power of attorney coupled with an interest on behalf of each Unit Owner and each such holder or Person to make, sign and record on behalf of each Unit Owner and each such holder and Person any amendment described in this Paragraph G.  Each deed, mortgage, trust deed, other evidence of obligation or other instrument affecting a Unit or the Property and the acceptance of any such instrument shall be deemed to be a grant and acknowledgment of, and a consent to the reservation of, the

aforedescribed power of attorney to the Developer, to make, sign and record on behalf of each of the Unit Owners, holders and Persons described in this Paragraph any amendment described in this Paragraph. The power of attorney described in this Paragraph shall terminate five years from the recording date of this Declaration.

H. Invalidity. The invalidity of any covenant, restriction, condition, limitation, or any other provision of this Declaration, or any part of the same, shall not impair or affect in any manner the validity, enforceability or effect of the remainder of this Declaration.

I. Perpetuities and Restraints. If any of the options, privileges, covenants, or rights created by this Declaration would otherwise be unlawful or void for violation of (i) the rule against perpetuities or some analogous statutory provision, (ii) the rules restricting restraints on alienation, or (iii) any other statutory or common law rules imposing time limits, then such provision shall continue only until twenty-one (21) years after the death of the last to die of the now living lawful descendants of George W. Bush, President of the United States, and Richard J. Daley, Mayor of the City of Chicago.

J. Liens. In the event any lien exists against two (2) or more Units and the indebtedness secured by such lien is due and payable, the Unit Owner of any such Unit so affected may remove such Unit and the undivided interest in the Common Elements appertaining thereto from such lien by payment of the proportional amount of such indebtedness attributable to such Unit. In the event such lien exists against all of the Units or against the Property, the amount of such proportional payment shall be computed on the basis of the percentage set forth in this Declaration. Upon payment as herein provided, it is the duty of the encumbrancer to execute and deliver to the Unit Owner a release of such Unit and the undivided interest in the Common Elements appertaining thereto from such lien. The owner of any Unit shall not be liable for any claims, damages, or judgments, entered as a result of any action or inaction of the Board other than for mechanics liens as hereinafter set forth. Each Unit Owner's liability for any judgment entered against the Board or the Association, if any, shall be limited to such Unit Owners proportionate share of the indebtedness as set forth herein, whether collection is sought through assessment or otherwise. A Unit Owner shall be liable for any claim, damage, or judgment entered as a result of the use or operation of his Unit, or caused by his own conduct. After the Developer conveys to any person title to any Unit, no mechanics lien shall be created against such Unit or its Common Element interest by reason of any subsequent contract by the Developer to improve or make additions to the Property.

If as a result of work expressly authorized by the Board, a mechanic's lien claim is placed against the Property or any portion of the Property, each Unit Owner shall be deemed to have expressly authorized it and consented thereto, and shall be liable for the payment of his Unit's proportionate share of any due and payable indebtedness.

K. Release of Claims. Each Unit Owner hereby waives and releases any and all claims which he may have against any other Unit Owner, Occupant, the Association, its officers, members of the Board, the Developer, the managing agent, and their respective employees and agents, for damage to the Common Elements, the Units, or to any personal property located in the Units or Common Elements, caused by fire or other casualty, to the extent that such damage is covered by fire or other form of casualty insurance.

G:DecksandAmendmentsFolder:DeclarationlDREL6/22/01.doc

30

L. Construction. The provisions of this Declaration shall be liberally construed to effectuate its purpose of creating a uniform plan for the operation of first class condominium buildings.

M. Headings and Gender. The headings and captions contained in this Declaration are inserted for convenient reference only and shall not be deemed to construe or limit the Articles and Paragraphs to which they apply. The word "his" whenever used in this Declaration shall include the masculine, feminine and neuter pronouns.

N. Ownership of Land Trust. In the event title to any Unit Ownership is conveyed to a land title holder trust under the terms of which all powers of management, operation, and control of the Unit Ownership remain vested in the trust beneficiary or beneficiaries, then the Unit Ownership under such trust and the beneficiaries thereunder from time to time shall be responsible for payment of all obligations, liens or indebtedness and for the performance of all agreements, covenants and undertakings chargeable or created under this Declaration against such Unit Ownership. No claim shall be made against any such title holding trustee personally for payment of any lien or obligation created under this Declaration and the Trustee shall not be obligated to sequester funds or trust property to apply in whole or in part against such lien or obligation. The amount of such lien or obligation shall continue to be a charge or lien upon the Unit Ownership and the beneficiaries of such trust notwithstanding any transfers of the beneficial interest of any such trust or any transfers of title of such Unit Ownership.

O. Utilities. Each Unit Owner shall promptly pay when due the cost for all telephone, electricity and other utilities which are separately metered or billed to such Unit Owner by the Utility Company furnishing such utility. Utilities for the Property which are not separately metered or billed shall be part of the Common Expenses and paid by the Board.

## ARTICLE XIX

A. Annexing Additional Property. Developer reserves the right from time to time, within ten (10) years of the date of the recording of this Declaration, to annex and add to the Condominium area created by this Declaration all or any portion of the real property legally described as follows, which real property is hereinafter referred to as the "Additional Land Area" (SEE EXHIBIT "C"). No rights of any character whatever within the Additional Land Area attach to any Owner, except as to that portion described in any recorded Amendment to the Declaration annexing and adding such portion to this Declaration as part of the Condominium Area created by this Declaration.

In the event of any such addition, the Developer further reserves the right to reallocate percentage interests in the Common Elements in accordance with the provisions of the Illinois Condominium Act by recording an amended plat in accordance with Section 5 of said Act, together with an amendment to this Declaration in accordance with Section 6 of said Act. The approval of any of the Unit Owners to such amendments shall not be required.

B. Common Elements Percentage Changes in the Event of Annexation. The Percentages of undivided ownership interest in the Common Elements as amended by such Amendment to the Declaration shall be determined and adjusted in the following manner:

The Common Elements as amended by such Amendment to the Declaration shall be deemed to consist of:

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

1. the Common Elements as existing immediately prior to the recording of such Amendment to the Declaration (hereinafter referred to as the "Existing Common Elements") and

2. the Common Elements added by such Amendment to the Declaration (hereinafter referred to as "Added Common Elements").

The Units as amended by such Amendment to the Declaration shall be deemed to consist of:

1. the Units as existing immediately prior to the recording of such Amendment to the Declaration (hereinafter referred to as the "Existing Units") and

2. the Units added by such Amendment to the Declaration (hereinafter referred to as the "Added Units").

The value of each of the Added Units which value shall be determined by the Developer or its beneficiaries or agents, whose determination shall be unconditionally conclusive for all purposes, sales price of any Unit notwithstanding, shall be added to the aggregate value of the Existing Units as previously unconditionally conclusively determined by the Declarant, its agents or beneficiaries and the total thereof shall be deemed to be new value of the Property. As a whole, the value of all Units, both existing and added, shall be determined as of the date of recording of each such Amendment.

The percentages of undivided ownership interest, as amended and adjusted by such Amendment to the Declaration, in the entire Common Elements, consisting of the Existing Common Elements plus the Added Common Elements, to be allocated among all the Units, consisting of the Existing Units plus the Added Units, shall be computed by taking as a basis the square feet of each Unit in relation to the square feet of the Property as a whole, determined as aforesaid.

The Existing Units shall be entitled to their respective percentages of Ownership, as amended and adjusted in the Added Common Elements as well as the Existing Common Elements.

The Added Units shall be entitled to their respective percentages of ownership, not only in the Added Common Elements, but also in the Existing Common Elements.

Each and all of the provisions of this Declaration and the Exhibits attached hereto, as amended by such successive Amendment to the Declaration and the amended Exhibits attached thereto, shall be deemed to apply to each and all of the Units, including all such Added Units as well as all Existing Units, and to all of the Common Elements, including such Added Common Elements as well as all Existing Common Elements.

The recording of an Amendment to the Declaration shall not alter or affect the amounts of any liens for common expenses due from any Existing Unit Owners prior to such recording, nor the respective amounts theretofore assessed to or due from Existing Unit Owners for common expenses or other assessments.

Each Amendment to the Declaration shall include an amendment to the legal description on the first page of this Declaration which shall add to the legal description of the Parcel that

G:Deck.sandAmendmentsFolder:DeclarationDEREL6/22/01.doc

portion or portions of the Additional Land annexed to the Property; and an amendment to the Plat (Exhibit "A" attached hereto) which shall show the boundaries of the portion or portions of the Additional Land annexed to the Parcel, and delineating and describing the Units constructed or to be constructed on the portions of the annexed Additional Land.

C. Mortgage Benefit. The lien of any mortgage encumbering any Existing Unit, together with its appurtenant percentage of undivided ownership interest in the Existing Common Elements, shall automatically be deemed to be adjusted and amended when an Amendment to the Declaration is recorded in accordance with the Common Elements for such Existing Unit and the lien of such mortgage shall automatically attach in such percentage to the Added Common Elements.

D. Consent to Amendment and Annexation. Each and all of the Unit Owners, of all Existing Units and of all Added Units hereafter, and their respective mortgagees, grantees, heirs, administrators, executors, legal representatives, successors, and assigns, by their acceptance of any deed or mortgage or other interest in or with respect to any of such Units, shall be deemed to have expressly agreed, assented, and consented to each and all of the provisions of this Declaration, with respect to the recording of Amendments to the Declaration as aforesaid which may amend and adjust their respective percentages of undivided ownership interest in the Common Elements, including the Existing Common Elements and Added Common Elements from time to time as here above provided; and hereby further agree to each and all of the provisions of each and all of said Amendments to the Declaration which may hereafter be recorded in accordance with the foregoing provisions of this Declaration:

1. The portion of the additional land area described in each such Amendment to the Declaration shall be governed in all respects by the provisions of this Declaration;

2. The percentage of ownership in the Common Elements appurtenant to each Unit shall automatically be shifted and reallocated to the extent set forth in each such recorded Amendment to the Declaration and upon the recording of each such Amendment to the Declaration, the amount by which such percentage appurtenant to a Unit is reduced, as set forth in each such recorded Amendment to the Declaration, shall thereby be and be deemed to be released and divested from such Unit Owner and reconveyed and reallocated among the other Unit Owners as set forth in each such recorded Amendment to the Declaration. .

3. Each deed, mortgage, or other instrument affecting a Unit shall be deemed given subject to the conditional limitation that the percentage of ownership in the Common Elements appurtenant to each Unit shall, upon the recording of each Amendment to the Declaration, be divested pro tanto to the reduced percentage set forth in such Amendment to the Declaration and vested among the other Owners, mortgagees, and others owning an interest in the other Units in accordance with the terms and percentages of each such recorded Amendment to the Declaration.

4. A right of revocation is hereby reserved by the grantor in each such deed, mortgage, or other instrument of a Unit to so amend and reallocate the percentages of ownership in the Common Elements appurtenant to each Unit.

5. The percentage of ownership in the Common Elements appurtenant to each Unit shall include and be deemed to included any additional Common Elements annexed hereto by a recorded amendment to the Declaration and each deed, mortgage, or other instrument

G:DecksandAmendmentsFolder\Declaration\OREL8/22/01.doc

33

FILED DATE: 8/27/2019 11:10 AM    2019CH09898

affecting a Unit shall be deemed to include such additional Common Elements and the ownership of any such Units and lien of any such mortgage shall automatically include and attach to such additional Common Elements as such Amendments to the Declaration are recorded.

6. Each owner shall have a perpetual appurtenance to his Unit, for the use of any additional Common Elements annexed thereto by and described in any recorded Amendment to the declaration, for the purposes therein set forth, except as to any portion the use of which is limited by exclusive easements granted to the Owners of specific Units as may be provided in any such Amendment to the Declaration.

7. The recording of each such Amendment to the Declaration shall not alter the amount of the lien for the expenses assessed to a Unit prior to such recording.

8. Each Owner by acceptance of the deed conveying his Unit, agrees for himself and all those claiming under him, including mortgagees, that this Declaration and each Amendment to the Declaration is and shall be deemed to be in accordance with the Act and for the purposes of this Declaration and the Act; any changes in the respective percentages of ownership in the Common Elements as set forth in each such Amendment to the Declaration shall be deemed to be made by agreement of all Unit Owners.

9. Declarant reserves the right to amend this Declaration in such manner and each Owner agrees to execute and deliver such documents necessary or desirable to cause the provisions of Article XIX of this Declaration to comply with the Act as it may be amended from time to time.

E. Time Limitation. The developer's right to annex any additional land shall terminate ten (10) years after the recording of this Declaration. If the option to annex additional land is exercised, then thereafter any contracts for construction and delivery of such additional land and improvements thereof shall contain a date for the completion of construction and delivery of such improvements and additional land.

F. Order of Making Additions. The Parcel of additional land is described in Article XIX, Paragraph A. Any portion thereof may be annexed within the aforementioned ten (10) year period at such different times and in such order as the Developer determines.

G. Limitations as to Location of Improvements. Any additional buildings containing units will be constructed on the additional land.

H. Maximum Number of Additional Units. The buildings referred to in the above paragraph A shall contain a maximum of forty-eight (48) additional units comprised of twelve (12) buildings.

I. Compatibility of Additional Units. The buildings which will contain the additional Units and the additional Units themselves, may be constructed in such manner so as to be compatible with the use, density, configuration, and architectural style of the property and the existing buildings.

J. Appurtenant Easement. There shall be an appurtenant easement over and on the common elements for the benefit of the Developer, its successors, and assigns for the purpose of

G:DeclusandAmendmentsFolder:DeclarationlOREL6/22/01.doc

34

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

making improvements and constructing buildings and Units on the additional land, and for the purpose of doing whatever is reasonably necessary and proper in conjunction therewith.

K. <u>Annexation of the Additional Land is Not Obligatory.</u>   No provision of this Declaration shall be construed to be binding upon or obligate the Developer to exercise the option to make additions, and the additional land described in Article XIX shall not be bound thereby.

L. <u>Additions and Modifications to the Declaration.</u>   Any amendment to this Declaration adding additional land may contain such complementary additions and modifications of the provisions of this declaration affecting the additional land which are necessary to reflect the differences in character, if any, of the additional land and the improvements thereto. In no event, however, shall any such amendment to a Declaration revoke, modify or add to the covenants established by this Declaration for the property already subject to this Declaration.

### ARTICLE XX
### VILLAGE OF OAK LAWN RIGHTS

A. <u>IN GENERAL.</u>   In addition to any rights, powers or easements granted to the Village of Oak Lawn elsewhere in this Declaration, the Village of Oak Lawn shall have the rights, powers and easements set forth in this Article.

B. <u>Easements.</u>   The Village of Oak Lawn is hereby granted the right and easement of access over, across and through the property for any purposes reasonably related to the proper exercise of the rights and powers of the Village, including, without limitation, the right and easement (i) to come upon the Common Elements for the purpose of reading water meters installed by or on behalf of the Village and (ii) to come upon the Property and to install, lay, construct, renew, operate, maintain, repair and replace lines, pipes, pumps and other equipment (including housings for such equipment) into, over, along and through the Property for the purpose of providing water, storm sewer and sanitary sewer services, and (iii) to come upon the Property for the rendering of police and fire protection services.

C. <u>Public Utility Easement Provisions.</u>   All land as shown on the Plat, not including building sites or public utility and drainage easements, is hereby designated as a Blanket Easement and is to be used for ingress, egress, parking, driveways, entrances, lawn, landscaping, recreation, access to utilities and for the common uses and enjoyment of the property owners and the Village of Oak Lawn and authorized utility companies. This Blanket Easement is hereby reserved for and granted to the Village of Oak Lawn and to those public utility companies operating under franchise from the Village of Oak Lawn, including, but not limited to, Ameritech, Nicor Gas Company, ComEd Company and the Cable Television franchise and their successors and assigns over all the above mentioned Blanket Easement for the Perpetual right, privilege and authority to construct, reconstruct, repair, inspect, maintain and operate various utility transmission and distribution systems and including water mains and services, storm and/or sanitary sewer mains, drainage facilities, swales, ditches and overflows and other structures and appurtenances as may be deemed necessary by said Village, over, upon, along, under through said indicated Blanket Easement, together with right of access across the property for necessary men and equipment to do any of the above work. The right is also granted to cut down, trim or remove any trees, shrubs or other plants on the Blanket Easement that interfere with the operation of the sewers or other utilities. No permanent structures shall be placed on said Blanket Easement, but same may be used for gardens, shrubs, landscaping and other purposes that do

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

not then or later interfere with the aforesaid uses or rights. Where the easement is used both for sewer and other utilities, the other utility installation shall be subject to the ordinances of the Village of Oak Lawn.

D. Maintenance. The Association shall maintain the Property in compliance with all applicable laws and ordinances of the Village and all governmental bodies having jurisdiction over the Property, as such laws and ordinances may be amended and enforced from time to time. Without limiting the foregoing, the Association shall:

1. Maintain the property free from accumulation of debris and growth of weeds;

2. Maintain all buildings and structures in accordance with applicable building, safety and other codes and ordinances;

3. Maintain all parkway areas on dedicated rights of way as a Common Expense; and

4. Otherwise maintain the Common Elements in such manner as to not be detrimental to the health, safety and welfare of the residents of the Village and the residents of the condominiums and members of the Association.

E. Protective Covenants. All property within lots 352 through 365, inclusive, excluding the final building sites, is a common easement and is to be used for parking, entrances, lawn recreation, access, utility easements for the benefit of the Village for sewers, watermains and drainage, for ComEd, Electric Company, Ameritech Telephone Company and Nicor Gas Company and for the enjoyment of the property owners of said lots. Said common easement is not dedicated for public use.

**THE REST OF THIS PAGE HAS INTENTIONALLY BEEN LEFT BLANK**

G:DecksandAmendmentsFolder.Declaration/DREL6/22/01.doc

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

IN WITNESS WHEREOF, the Declarant has caused its corporate seal to be affixed hereunto and caused its name to be signed hereto by its duly authorized officers, this ᘔ5ᵗʰ day of June , 2001.

New Lenox State Bank,
Trust Agreement Number 2033,
Dated January 18, 1996

BY:_____
 Exec Vice President and Trust Officer

ATTEST:_____
 Assistant Trust Officer

STATE OF ILLINOIS )
                  ) SS
COUNTY OF COOK    )

I, the undersigned, a Notary Public in and for the County and State aforesaid, DO HEREBY CERTIFY THAT Ronald Kokal , who is Vice President and Trust Officer of New Lenox State Bank, as Trustee under Trust Number 2033 dated January 18, 1996 and JoAnn Gleason , who is Assistant Trust Officer, of the same corporation, personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such Vice President and Trust Officer, respectively, appeared before me this day in person and acknowledged that they signed and delivered the said instrument as their own free and voluntary act, and as the free and voluntary act of said corporation, for the uses and purposes therein set forth, there acknowledge that he, as custodian of the Corporate Seal of said corporation, affixed the corporate seal to the foregoing instrument as his free and voluntary act and as the free and voluntary act of the Corporation, for the uses and purposes therein set forth.

GIVEN under my hand and Notarial Seal this 26ᵗʰ day of June ,
2001.

"OFFICIAL SEAL"
Candi Pesavento
Notary Public, State of Illinois
My Commission Expires May 5, 2003

_____
NOTARY PUBLIC

My Commission Expires: 5/5/2003

G:DecksandAmendmentsFolder.DeclarationtOREL6/22/01.doc

FILED DATE: 8/27/2019 11:10 AM 2019CH09898

## CONSENT OF MORTGAGEE

New Lenox State Bank, the owner and holder of the mortgages; dated March 2, 1999 and recorded March 30, 1999 as Document No. 99-303217; dated March 3, 2000 and recorded April 16, 2000 as Document No. 00-241201 in the Office of the Recorder of Deeds of Cook County, Illinois, on the property, hereby consent to the execution and recording of the Declaration of Condominium Ownership and of Easements, Restrictions and Covenants for Lorel Condominium Association

IN WITNESS WHEREOF, the said New Lenox State Bank has caused the instrument to be signed by its duly authorized officers on its behalf; all done at New Lenox, Illinois, on the 25 day of JUNE , 2001.

By: _____

New Lenox State Bank

ATTEST:

_____

STATE OF ILLINOIS )
                  ) SS
COUNTY OF COOK )

I, Candi Pesavento a Notary Public in and for the said County and State, DO HEREBY CERTIFY that Ronald W Koland and JoAnn Gleason , the Executive President and Trust Officer respectively of, New Lenox State Bank, personally known to me to be same persons whose names are subscribed to the foregoing instrument as such Executive and Trust Officer , appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act, and as the free and voluntary act of said corporation, or the uses and purposes therein set forth.

Given under my hand and notarial seal the 20th day of June , 2001.

_____
NOTARY PUBLIC

My Commission Expires:

5/5/2003

"OFFICIAL SEAL"
Candi Pesavento
Notary Public, State of Illinois
My Commission Expires May 5, 2003

G:DecksandAmendmentsFolder\DeclarationlOREL8/22/01.doc

38

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

## RIDER ATTACHED TO LOREL CONDOMINIUM ASSOCIATION
## TRUST DATED JANUARY 18, 1996 UNDER TRUST NO. 2033

Executed and delivered NEW LENOX STATE BANK, TRUSTEE, not in its individual capacity, but solely in the capacity herein described, for the purpose of binding the herein described property, and it is expressly understood and agreed by the parties hereto, anything herein to the contrary notwithstanding that each and all of the undertakings and agreements herein made, are made and intended not as personal undertakings and agreements of the Trustee, or for the purpose of binding the Trustee personally, but executed and delivered by the Trustee solely in the exercise of the powers conferred upon it as such Trustee, and no personal liability or personal responsibility is assumed by, or shall at any time be asserted or enforced against said trustee on account hereof or on account of any undertaking or agreement herein contained, either expressed or implied. All such personal liability, if any being hereby expressly waived and released by all other parties hereto, and those claiming by, through or under them.

New Lenox State Bank, not individually,
but as Trustee under Trust Agreement
Number 2033 dated January 18, 1996.

BY:_____
Vice President & Trust Officer

ATTEST:_____
Assistant Trust Officer

G:DeckusandAmendmentsFolder:DeclarationlOREL6/22/01.doc

39

FILED DATE: 8/27/2019 11:10 AM   2019CH09898

## EXHIBIT "B"
## PERCENTAGE INTERESTS IN COMMON ELEMENTS
## LOREL CONDOMINIUM ASSOCIATION

| UNITS | PERCENT INTEREST |
|-------|------------------|
| 11009 | 12.5% |
| 11011 | 12.5% |
| 11013 | 12.5% |
| 11015 | 12.5% |
| 5201 | 12.5% |
| 5203 | 12.5% |
| 5205 | 12.5% |
| 5207 | 12.5% |
| | 100.0% |

G:DecksandAmendmentsFolder;Declaration\OREL6/22/01.doc

40

EXHIBIT "C"
ADDITIONAL LAND

Lots 354 through and including Lot 365 in Phase Six of Eagle Ridge Subdivision being a subdivision of Part of the SouthWest ¼ of Section 16, Township 37 North, Range 13 East of the Third Principal Meridian, in Cook County, Illinois.

# EXHIBIT ATTACHED



**KOVITZ
SHIFRIN
NESBIT**

175 North Archer Avenue | Mundelein, IL 60060   T 847.537.0500 | F 847.537.0550
55 West Monroe Street, Suite 2445 | Chicago, IL 60603   T 312.372.3227 | F 312.372.4646
1220 Iroquois Avenue, Suite 100 | Naperville, IL 60563   T 630.717.6100 | F 630.548.5568
209 8th Street | Racine, WI 53403   T 262.634.6750 | F 847.537.0550

ksnlaw.com

**35** YEARS
ANNIVERSARY

July 18, 2018

<u>Via e-mail (Tom_livingston@csx.com)</u>

Reply to: Mundelein
T 847.777.7233
F 847.777.7381
mkreibich@ksnlaw.com

CSX Railroad
Tom Livingston

**Re:     Tree Roots affecting Lorel Condominium Association in Oak Lawn, Illinois**

Dear Mr. Livingston:

As the attorneys for the Lorel Condominium Association ("the Association"), we have been asked by the Board of Director to contact CSX Railroad ("CSX") regarding the ongoing issue of tree roots originating on CSX property affecting and destabilizing the adjacent Association's wall.

It is our understanding that CSX agreed to have the trees at issue removed. To that end, the Board marked various trees in yellow paint for easy of identification. However, as of the date of this letter, these trees which are threatening the integrity of the wall have not been appropriately removed.

CSX has the obligation to mitigate any damage these trees are creating to the Association's wall. Therefore, it is the Demand of the Board that these trees that have been 'marked for removal', must be removed by CSX before **August 1, 2018** .

Note that the failure to have this work performed by **August 1, 2018** will cause the Association to act in their best interests for the safety of their residents to proceed and pursue your financial participation for the removal of these trees. Your failure to cooperate will leave the Association no choice but to pursue its legal options against you to recover its costs. If you have any other questions or concerns please contact this office.

Sincerely,

Michael G. Kreibich

MGK:cam

cc:     Board of Directors

**FILED
8/27/2019 11:10 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH09898**



CLO16:00100 3634962.1

FILED DATE: 8/27/2019 11:10 AM   2019CH09898



175 North Archer Avenue | Mundelein, IL 60060   T 847.537.0500 | F 847.537.0550
55 West Monroe Street, Suite 2445 | Chicago, IL 60603   T 312.372.3227 | F 312.372.4646
1220 Iroquois Avenue, Suite 100 | Naperville, IL 60563   T 630.717.6100 | F 630.548.5568
209 8th Street | Racine, WI 53403   T 262.634.6750 | F 847.537.0550

ksnlaw.com

**35** YEARS
ANNIVERSARY

September 17, 2018

<u>**Via e-mail**</u> (Tom_livingston@csx.com)

CSX Railroad
Tom Livingston

Reply to: Mundelein
T 847.777.7233
F 847.777.7381
mkreibich@ksnlaw.com

**Re:   Tree Roots affecting Lorel Condominium Association in Oak Lawn, Illinois**

Dear Mr. Livingston:

As you are aware, we represent the Lorel Condominium Association ("the Association") located in Oak Lawn, Illinois. We have again been asked by the Board of Directors to contact CSX Railroad ("CSX") regarding the ongoing issue of tree roots originating on CSX property affecting and destabilizing the adjacent Association's wall.

It is our understanding that CSX has removed the offending trees / roots on approximately 50% of the length of the Association's wall, for which we thank you. However, there is still a significant amount of trees pushing against and destabilizing the other 50% span of the wall. A large crack was recently observed in this section of wall.

CSX has the obligation to mitigate any damage these trees are creating to the Association's wall. Therefore, the Association is asking that CSX remove **all trees** within 1 foot of the Association's wall, for the remaining 50% span of the wall before **October 15, 2018**.

We thank you for your anticipated cooperation in completing this work. However, the failure to have this work performed by **October 15, 2018** will cause the Association to act in their best interests for the safety of their residents and seek your financial participation for the removal of these trees. Current quotes indicate the costs are approximately $8,000 to complete this work, should the Association proceed on their own in which case the Association will pursue its legal options against you to recover its costs. If you have any other questions or concerns please contact this office.

Sincerely,

Michael G. Kreibich

MGK:cam

cc:   Board of Directors

FILED
8/27/2019 11:10 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019CH09898

FILED DATE: 8/27/2019 11:10 AM  2019CH09898



EXHIBIT
C

iManage\CLO16\00100\3695644.\1-9/17/18